IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| M.Z. and N.H.,<br><br>       Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF ILLINOIS, and THE BOEING COMPANY CONSOLIDATED HEALTH AND WELFARE PLAN,<br><br>       Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:20-cv-00184-RJS-CMR<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

This case arises out of Defendants'—Blue Cross Blue Shield of Illinois (BCBS) and the Boeing Company Consolidated Health and Welfare Plan (the Plan)—denial of coverage for Plaintiff N.H.'s residential mental health treatment.  Plaintiffs filed this lawsuit claiming Defendants failed to comply with the Employee Retirement Income Security Act of 1974 (ERISA) and the Mental Health Parity and Addiction Equity Act (Parity Act) in denying benefits.  Before the court are the parties' cross-motions for summary judgment.[1]  For the reasons stated below, Plaintiffs' Motion is DENIED, and Defendants' Motion is GRANTED in part and REMANDED in part.

---

[1] Dkt. 42, *Plaintiffs' Motion for Summary Judgment* (*Plaintiffs' MSJ*); Dkt. 40, *Defendants' Motion for Summary Judgment* (*Defendants' MSJ*).

1

# BACKGROUND[2]

Plaintiffs M.Z. and her son N.H. are, respectively, a participant in and beneficiary of the Plan.[3]  The Plan is a self-funded employee welfare benefits plan governed by ERISA, for which BCBS is the claims administrator.[4]  Before turning to the legal issues, the court will review the relevant Plan language, N.H.'s medical and treatment history, and the procedural history of this case.

## I.    The Plan

The Plan pays benefits for "medically necessary" services.[5]  Medically necessary services are those which meet the following Plan criteria:

- Required to diagnose or treat the patient's illness, injury or condition, and the condition cannot be diagnosed or treated without it.
- Consistent with the symptom or diagnosis and the treatment of the condition.
- The most appropriate service or supply that is essential to the patient's needs.
- Appropriate as good medical practice.
- Professionally and broadly accepted as the usual, customary, and effective means of diagnosing or treating the illness, injury, or condition.
- Unable to be provided safely to the patient as an outpatient (for an inpatient service or supply).
- Not experimental or investigational . . . .[6]

BCBS also utilizes licensed evidentiary medical standards called the Milliman Care Guidelines (MCG) to evaluate whether services are medically necessary.[7]

---

[2] In evaluating cross-motions for summary judgment, the court must present a neutral summary of the facts.  *Stella v. Davis Cnty.*, No. 1:18-cv-002, 2019 WL 4601611, at *1 n.1 (D. Utah Sept. 23, 2019).  However, when addressing the merits of each motion in turn, the court will construe the facts favorably toward the respective nonmoving party.  *Id.*  Except where noted, the facts are generally undisputed.

[3] Dkt. 2, *Complaint* ¶ 3.

[4] *Id.* ¶¶ 2, 3.

[5] Dkt. 38, *Administrative Record* (*AR*) [SEALED] at 420.

[6] *AR* at 420.

[7] *AR* at 205.

As relevant here, the MCG set forth admission criteria to determine the medical necessity of residential behavioral health care for adolescents.[8]  Around-the-clock behavioral care is medically necessary if at least one of the following criteria are present:

- Danger to self due to **1 or more** of the following
  - Auditory hallucinations that are contributing to the risk for suicide or serious Harm[9] to self are present.
  - Patient has persistent Thoughts of suicide[10] or serious Harm to self that cannot be monitored adequately at a lower level of care as indicated by [certain risk factors].
- Danger to others is present due to **1 or more** of the following:
  - Auditory hallucinations or paranoid delusions contributing to risk for homicide or serious Harm to another are present.
  - Patient has persistent thoughts of homicide or serious Harm to another that cannot be monitored adequately at a lower level of care as indicated by [various risk factors].
- Behavior health disorder is present with **ALL** of the following:
  - Moderately severe psychiatric or behavioral symptoms requiring treatment are present daily (or near daily), including **1 or more** of the following:
    - Hallucinations that are somewhat bothersome to patient or are associated with some pressure to respond to voices are present.
    - Delusions that are somewhat bothersome to patient or are associated with some pressure to act on beliefs are present.
    - Disorganized speech that often is difficult to follow is present.
    - Frequent abnormal or bizarre motor behavior is present.
    - Moderate negative symptoms . . . are present.
    - Mania (e.g., frequent but not daily, periods of extensive mood elevation or irritability) is present.
    - Moderately severe depression is present.
    - Moderately severe anxiety is present.
    - Major comorbid substance use disorder (e.g., daily or near daily use) is present and poses a serious threat to health or is expected to impede recovery from underlying primary psychiatric disorder.

---

[8] *AR* at 205, 396.

[9] "Harm" as defined within MCG, "is considered serious if it has a substantial likelihood of causing death, disability, or major disfigurement." *AR* at 384.

[10] "Thoughts of suicide" are defined by MCG as "thoughts serving as the agent of one's own death, to be distinguished from thoughts of death that do not involve actively bringing death about." *AR* at 394 (internal citation and quotation omitted).

- Major impairment in behavior, including physical or verbal aggression, disruptive behaviors, or internal or external anger manifestations . . . .
- Other psychiatric symptoms which are acute (e.g., hyperactivity, agitation, cognitive impairment, obsessions, compulsions, or other acute symptoms) or represent a worsening baseline[.]

o Serious dysfunction in daily living is present as indicated by **1 or more** of the following:
  - Serious deterioration in interpersonal interactions (e.g., impulsive or abusive behaviors) is present.
  - Significant withdrawal and avoidance of almost all social interaction is present.
  - Consistent failure to achieve self-care as appropriate to age or developmental level is present.
  - Serious disturbance in vegetative status (e.g., weight change, sleep disruption) threatening physical function is present.
  - Inability to perform adequately in school (including specialized setting) due to disruptive or aggressive behavior is present.
  - Severely diminished ability to assess consequences of own actions is present (e.g., acts of severe property damage).[11]

The Plan requires preadmission approval to obtain coverage for residential mental health services.[12]  Subsequent claims for benefits must be submitted within twelve months from the date of service.[13]  "Any claims submitted after that time will be denied."[14]

If a claim for coverage is denied, the Plan provides an internal review process.[15]  A claimant may appeal within 180 days of receiving written notification of the denial.[16]  Appeals must include an explanation of why the claim should have been approved, along with

---

[11] *AR* at 396–97.

[12] *AR* at 443.

[13] *AR* at 270.

[14] *Id.*

[15] *AR* at 267.

[16] *Id.*

information and documents relevant to the appeal.[17]  Failing to file an appeal with 180 days

waives that right.[18]

 In cases raising questions requirement medical judgment, a designated committee

reviews appeals along with an impartial health care professional.[19]  The Plan allows the

committee to delegate its role as claims administrator to another party, which it did to BCBS in

2011.[20]  In that role, BCBS has "full discretionary authority to interpret the Plan, including the

power to construe ambiguities" when making a benefit determination.[21]  Nonetheless, BCBS

must still provide specific reasons for denying benefits, including a description of the criteria

used to deny the claim.[22]  After exhausting the internal appeals process, a claimant may

challenge a final denial through a civil action under ERISA.[23]

## II. N.H.'s Medical History and Residential Treatment[24]

 N.H. began therapy at age eight, after being diagnosed with obsessive compulsive

disorder (OCD) and possible attention-deficit/hyperactivity disorder (ADHD).[25]  By junior high,

N.H. began refusing treatment.[26]  He started using drugs and engaging in risky behaviors, going

for a "joy ride" in a stolen car and egging a neighbor's house.[27]  Also in junior high, N.H. was

---

[17] *Id.*

[18] *Id.*

[19] *AR* at 268.

[20] *See* Dkt. 40-1 at § 4.3; Dkt. 40-2; Dkt. 40-3.

[21] *See* Dkt. 40-1 at § 4.1(a).

[22] *AR* at 269.

[23] *AR* at 270.

[24] The following facts are drawn from a historical narrative provided by M.Z.  There is documentation corroborating the psychological evaluation and the declining grades at the boarding school but not for the remaining facts.  *See AR* 1195–1214, 1222–28.

[25] *Complaint* ¶ 9.

[26] *Complaint* ¶ 10.

[27] *Complaint* ¶ 10; *see, e.g., AR* at 84.

bullied by peers and struggled with severe depression and anxiety.[28]  Between November 2014 and June 2015, N.H. was hospitalized three times for suicidal ideation and attended several intensive outpatient programs with limited success.[29]  Following these episodes, N.H.'s parents requested a psychological evaluation to ascertain how best to treat their son.[30]

The psychological tests showed N.H. had average cognitive abilities but significant difficulties with executive functioning.[31]  Emotionally, N.H. displayed serious struggles with anxiety, OCD, and depression.[32]  Coupled with a lack of coping skills, N.H. had a tendency to become overloaded and disengage, thereby negatively impacting his decision-making.[33]  N.H. also demonstrated increased defiance and anger through self-destructive behaviors, and a disregard for future consequences.[34]

In September 2015, N.H. attended a residential treatment center.[35]  N.H. was progressing well at the center until two traumatic events occurred: first, he was sexually assaulted by an older peer, and second, he fractured his arm after an employee placed him in a therapeutic hold.[36]  In June 2016, following those incidents, N.H. returned home and attended an intensive outpatient program.[37]

---

[28] *AR* at 84.

[29] *Id.*

[30] *AR* at 1195.

[31] *AR* at 86, 1195–1214.

[32] *AR* at 1211.

[33] *Id.*

[34] *Id.*

[35] *AR* at 86.

[36] *AR* at 84.

[37] *Complaint* ¶ 12; *AR* at 84.

Once N.H. was home, his parents separated and began divorce proceedings.[38]  His sister attempted suicide with N.H. present.[39]  N.H. himself became physically and verbally aggressive—smashing dishes and photographs, threatening to kill his mother, M.Z., and wrapping his hands around M.Z.'s neck a few times.[40]  According to M.Z., N.H.'s therapist suggested establishing a safety plan because the therapist "was sure N.H. would eventually harm" M.Z.[41]  On one occasion, M.Z. called the police for support when N.H. refused to stop throwing knives.[42]  Finally, after N.H. was expelled from school for punching a boy who insulted him, his parents sent him to a private boarding school in April 2017.[43]

N.H. did fairly well at the boarding school to start.[44]  However, while home for Thanksgiving in November 2017, N.H. threatened M.Z., physically assaulted her, and threw her phone into the bushes.[45]  M.Z. again called the police for support.[46]  Upon returning to boarding school after Thanksgiving, N.H.'s grades declined and M.Z. reported he was having paranoid thoughts.[47]  In March 2018, while on spring break in California, N.H. ran away.[48]  He refused to return to school, stopped communicating with his parents, and eventually had to be tracked down

---

[38] *AR* at 31.

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *AR* at 31; 1226–28.

[44] *AR* at 1222–28.

[45] *AR* at 31.

[46] *Id.*

[47] *Id.*

[48] *AR* at 32, 99.

by police.[49]  Following this episode, N.H. was transported to an outdoor behavioral health program in Oregon.[50]

Within ten days of his arrival in Oregon, N.H. ran away and reportedly spent the night in a tree with coyotes howling below.[51]  A week later, N.H. ran away again.[52]  There are no records from the Oregon program, but M.Z. reports that N.H.'s treatment team and therapist determined N.H. needed a higher level of care to obtain psychological testing because he was exhibiting bipolar and schizophrenic traits.[53]

A.  VIEWPOINT CENTER

On April 4, 2018, N.H. was transported directly from Oregon to ViewPoint Center, a residential mental health treatment program in Utah.[54]  While in transit, M.Z. spoke to N.H. and he reported no concerns, but less than ten minutes later N.H. called the police and reported he was being held against his will.[55]  M.Z. then spoke with the police to clarify the situation.[56]

N.H.'s parents decided to enroll him in ViewPoint based on their reports of violent behavior toward them, his paranoid comments, possible psychosis, hospitalization history, and his dishonesty and manipulation.[57]  ViewPoint staff administered a "Self-Harm/Suicide Risk Assessment" upon N.H.'s arrival.[58]  The Assessment indicated N.H. had never attempted suicide,

---

[49] *AR* at 32, 99.

[50] *AR* at 32, 86.

[51] *AR* at 32.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *AR* at 71, 84.

[58] *AR* at 856.

although "he did have suicidal ideation at the age of 13 when he's [sic] sister left for needed treatment."[59]  It also stated N.H. was not then harboring suicidal thoughts or thoughts of hurting himself, nor did he have plans for suicide or self-harm.[60]  The nurse conducting the assessment concluded N.H. was at "Mild Risk" for self-harm or suicide (with the options being No Risk, Mild Risk, Moderate Risk, and High Risk).[61]  In the initial visit with his primary psychiatrist, N.H. stated, "you will have no problems with me being aggressive to people and I don't want to hurt myself . . . I never have."[62]  The psychiatrist informed N.H. he would not force him to take any medications unless there were indications that N.H. posed an immediate threat to himself or others.[63]

N.H. also underwent an initial psychiatric evaluation with Nurse Crookston on his first day at ViewPoint.[64]  Nurse Crookston noted N.H.'s history, as recounted above, and quoted N.H. as saying "I don't know why I'm here[,] I have problems socially and stuff, but I don't see a reason to be here."[65]  Nurse Crookston observed N.H. as having poor personal hygiene and a flat affect.[66]  His responses were slow with some thought blocking, but N.H. denied having any delusions, hallucinations, or suicidal thoughts.[67]  Although N.H. denied having any suicidal ideation, he continued by stating he would use a gun if he were to commit suicide, but also that

---

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *AR* at 89.

[63] *Id.*

[64] *AR* at 71–77.

[65] *AR* at 71; *see also AR* 71–75.

[66] *AR* at 76.

[67] *AR* at 73, 76.

"he loves himself and doesn't want to commit suicide."[68]  Nurse Crookston noted several

possible risk factors for suicide, including: "poor impulse control, a history of violence toward

others, a substance misuse history, a history of paranoid delusions, [and] poor social support."[69]

The diagnosis upon admission included: Dysthymic Disorder (ruling out bipolar), Anxiety

Disorder, Unspecified Trauma, ADHD, Unspecified Neurodevelopmental Disorder (executive

functioning deficits), Cannabis Misuse (in remission), Parent-Child Conflict, History of Sexual

Abuse.[70]  The proposed treatment plan was for individual, group, and family therapy, as well as

recreational therapy and peer feedback.[71]  No medications were recommended in N.H.'s initial

treatment plan.[72]  Nurse Crookston did not evaluate the medical necessity for an extended stay at

ViewPoint.[73]

        N.H. remained at ViewPoint until May 31, 2018.[74]  Throughout his stay, N.H.

consistently denied thoughts of self-harm or suicide and his assigned therapist stated, "his

behavior has been reassuring that this is likely an accurate report."[75]  Staff notes indicate N.H.

generally "follow[ed] most program expectations."[76]  Sometimes, N.H. was perceived as

---

[68] *AR* at 73.

[69] *Id.*

[70] *AR* at 76.

[71] *Id.*

[72] *Id.*

[73] *See generally AR* at 71–76.

[74] *AR* at 149.

[75] *AR* at 707–708 (ViewPoint Psychotherapy Progress Notes, 4/24/18); *AR* at 90 (Therapist Notes 4/23/18 through 4/27/18); *see also, AR* at 749 (ViewPoint Psychotherapy Progress Notes, 4/16/18); *AR* at 761 (ViewPoint Weekly Psychotherapy Notes 4/16-4/20); *AR* at 802–803 (ViewPoint Psychotherapy Progress Notes, 4/10/18); *AR* at 849 (ViewPoint Psychotherapy Progress Note, 4/4/2018).

[76] *AR* at 687 (Viewpoint Center Daily Note 4/26/18); *see also AR* at 693 (Viewpoint Center Daily Note 4/25/18); *AR* at 701 (Viewpoint Center Daily Note 4/24/18 Swing Shift); *AR* at 703 (Viewpoint Center Daily Note 4/24/18 Day Shift); *AR* at 710 (ViewPoint Center Daily Note 4/23/18).

distracted, withdrawn, or anxious.[77]  But there were only a couple notable concerns during his stay.  At one point, N.H. became angry and verbally escalated during a group therapy call with his parents.[78]  Then, after a visit from his dad, N.H. was observed laughing to himself and struggled to comprehend questions staff asked him.[79]  The next week, after M.Z. visited, the therapist raised concerns over N.H. appearing more withdrawn, confused, and unstable in his thought patterns.[80]  The therapist wrote "the indication to implement medication is thus becoming more critical."[81]  N.H. was once caught possibly "grooming" a younger resident with a peer.[82]  And on another occasion N.H. acted out physically, during gym elbowing another resident who had irritated him earlier in the week.[83]

Shortly before N.H. was discharged, ViewPoint compiled a Multidisciplinary Report with a team of providers (ViewPoint Report).[84]  In the ViewPoint Report, N.H.'s therapist stated:

> [N.H.'s] presentation continues to reside as sub-threshold for justification of forced implementation of medication.  His willingness to mostly comply with behavioral expectations while at [ViewPoint] implies that he is just trusting enough to not engage in flagrantly disruptive ways.  By forcing medications, there are risks that he would regress in ways seen before, such as through AWOL efforts and/or repeated acts of dysregulated/aggressive behavior beyond what has been seen in his time here.  Also, at this point, the direction of his symptoms remains unclear; we do not yet know whether his attenuated/ebbing/flowing pattern of confusion, withdrawal, semi-delusional symptoms are indicative of a psychotic prodrome, eventual emergence of bipolar disorder, [and] manifestation of previously suppressed posttraumatic stress[.][85]

---

[77] *See, e.g.*, *AR* at 693 (Viewpoint Center Daily Note 4/25/18 Day Shift); *AR* at 701 (Viewpoint Center Daily Note 4/25/18 Swing Shift); *AR* at 712 (Viewpoint Center Daily Note 4/23/18).

[78] *AR* at 90.

[79] *AR* at 91 (Therapist Notes 4/30/18 through 5/4/18).

[80] *AR* at 91 (Therapist Notes 5/7/18 through 5/11/18).

[81] *Id.*

[82] *AR* at 788 (ViewPoint Center Daily Note 4/11/18).

[83] *AR* at 92 (Therapist Notes 5/14/18 through 5/18/18).

[84] *AR* at 78–139.

[85] *AR* at 94.

The Report diagnosed N.H. with: (1) persistent depressive disorder, (2) unspecified anxiety disorder, (3) unspecified trauma disorder, (4) social anxiety disorder, (5) other neurodevelopmental disorder related to executive functioning weaknesses and social challenges, (6) ADHD, (7) parent-child relational problems, and (8) *provisionally* other schizophrenia spectrum or psychotic disorder such as attenuated psychosis.[86]   Notwithstanding these diagnoses, the ViewPoint Report opined, "[o]verall [N.H.'s] behavior at ViewPoint was nonproblematic."[87]

A Neuropsychological Evaluation (Evaluation) was included in the ViewPoint Report, per a request from N.H.'s parents.[88]   The Evaluation observed that N.H. maintained appropriate dress, grooming, and hygiene.[89]   During the Evaluation, N.H. again denied experiencing hallucinations, delusions, and suicidal ideation.[90]   And "[t]here was no evidence during any of the interactions that [N.H.] was responding to internal stimuli or experiencing any psychotic thought processes."[91]   N.H. "appeared capable of controlling his behavior and maintaining a calm attitude."[92]   The Evaluation did note N.H. struggled to complete tasks and many of the planned measures aimed at assessing his capabilities had to be discontinued "to avoid undue stress."[93]   N.H.'s "overall performance was within the impaired range."[94]   He showed poor judgment, misperceptions of reality, and a lower than average ability to deal effectively with

---

[86] *AR* at 95.

[87] *AR* at 121.

[88] *AR* at 109; *see also AR* at 108–128.

[89] *AR* at 110.

[90] *AR* at 111.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] *AR* at 122.

everyday experiences.[95]  There were concerns that N.H. was in the early stages of developing a psychiatric disorder.[96]

The ViewPoint Report concluded by recommending N.H. receive residential treatment because, although "the diagnostic implications of [N.H.'s] attenuated symptoms of psychosis remain[ed] unclear,"[97] ongoing psychiatric services would be needed to monitor the possible evolution of psychosis and medication options.[98]  Of note, the ViewPoint Report indicated N.H. had been "friendly and pleasant to work with[,]" and "[a]ny program adequate for his needs would be privileged to have him be enrolled."[99]

## B.  INNERCEPT

After being discharged from ViewPoint, N.H. went directly to Innercept, a residential mental health treatment facility in Idaho.[100]  Upon arriving at Innercept on May 31, 2018, N.H. underwent an "Integral Assessment" (Innercept Assessment), which was signed by two therapists, a psychologist, a teacher, direct care staff, a registered dietician, and the medical director, Dr. George Ullrich.[101]  The Innercept Assessment gave a brief overview of the circumstances leading to N.H.'s placement at Innercept:

> N.H. has had a recent struggle with mental health challenges that includes a rapid decline in grades; increase in anxiety, anger, disorganized thoughts, violent outbursts; and running away.  He has had previous treatment interventions at home, in hospitalizations, and in residential placements, requiring him to transfer to a

---

[95] *Id.*

[96] *AR* at 123.

[97] *AR* at 96.

[98] *AR* at 96, 123–24.

[99] *AR* at 123.

[100] *AR* at 936.

[101] *AR* at 936–41.

program that can provide the high level of structure and support that can be obtained at the Innercept Residential Treatment Program.[102]

N.H. was given a provisional diagnosis that mirrored the one provided in the ViewPoint Report, omitting only the parent-child relational concerns.[103]

As to concerns of harm to himself or others, the Innercept Assessment noted that M.Z. "was not aware of any suicide attempts," and N.H. had "[d]enied any aggressive thoughts towards himself or others but was suspicious and guarded[, he] denied suicidality."[104]  Reports from ViewPoint indicated N.H. was not a danger to himself or others.[105]  The Innercept Assessment determined N.H. did not, at that time, present a risk for self-harm or harm to others, but a therapist recommended watching N.H. closely due to his history of becoming violent or suicidal.[106]

N.H. was seen by Dr. Ullrich at admission.[107]  Dr. Ullrich discussed the possibility of antipsychotic medications with M.Z. and the transferring clinician at Innercept, and expressed some concerns over N.H. not utilizing such medication.[108]  Dr.Ullrich noted N.H. could "regress[] in his thought organization as he went from a confined inpatient unit to a larger open space."[109]  But during observation N.H. "[d]id not exhibit responding to hallucinations visual or verbal" and denied having such experiences, although it was noted that "his guarded stance was

---

[102] *AR* at 936.

[103] *AR* at 941; *see supra* pg. 12.

[104] *AR* at 937, 941.

[105] *AR* at 940.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *Id.*

indirect confirmation of these delusional perceptions that he knows others do not accept."[110]
Given N.H.'s symptoms, his treatment plan included regular contact with a psychiatrist and
therapist, along with daily group therapy, all of which were prescribed to help him develop skills
to handle stress and thought disorders.[111]   The Innercept Assessment concluded, "[c]urrently,
[N.H.] requires an intensive residential setting to support him with his current struggles."[112]
There was no assessment of medical necessity.

    N.H. remained at Innercept's residential treatment facility for about two months.   During
that time, Dr. Ullrich attended several therapist sessions and eventually found there was a need to
prescribe medication.[113]   On August 1, 2019, Innercept transferred N.H. out of residential
treatment and into its transitional living program at Innercept Academy.[114]   N.H. remained at
Innercept Academy until June 30, 2020.[115]

### III.    Administrative Review Process

### A.  VIEWPOINT CENTER

#### i. Initial Denial and Level-One Appeal

    On May 8, 2018, BCBS denied coverage for N.H.'s stay at Viewpoint.[116]   The initial denial
letter stated "[a]ll information related to [the] request was received and reviewed by a Medical

---

[110] *AR* at 941.

[111] *AR* at 940.

[112] *AR* at 939.

[113] *AR* at 1033; *see also AR* at 954, 955, 1007, 1031, 1038, 1043–44.

[114] *Complaint* ¶ 42; *Defendants' MSJ* at 4.

[115] *Defendants' MSJ* at 4; Dkt. 57, *Plaintiffs' Opposition to Defendants' Motion for Summary Judgment* (*Plaintiffs' Opp.*) at 14–15.

[116] *AR* at 43.

Director" and coverage was denied because the services did "not meet the clinical criteria, guidelines or standards of care for diagnosis."[117]  BCBS explained,

> Per the medical necessity provision of your benefit booklet and/or summary plan description a medical necessity review has been completed.  Based on the clinical information provided, you did not meet MCG Residential Acute Behavioral Health Level of Care (Child/Adolescent) guidelines for the following reasons: There are no suicidal ideation/homicidal ideation/self-injurious behavior, aggression or psychosis.  There is no dangerous behavior.  There is no severe disability requiring acute residential intervention.  Your treatment can be safely managed at a lower level of care.  From the clinical evidence, you can be safely treated in a less restrictive setting such as Mental Health Intensive Outpatient Program (IOP).[118]

BCBS informed M.Z. she could appeal the denial if she disagreed with the decision.[119]

M.Z. appealed the denial on November 1, 2018.[120]  In her appeal, M.Z. first argued BCBS's medical necessity criteria violated the Parity Act by requiring acute-level symptoms before providing service at a sub-acute level facility.[121]  Quoting from a letter written by Dr. Michael S. Connolly, the medical director of ViewPoint, M.Z. stated that the risk of self-harm is an acute symptom and should not be a prerequisite to obtain care at a sub-acute residential facility.[122]

Second, M.Z. argued that N.H.'s residential care at ViewPoint was medically necessary.[123]  M.Z. recounted N.H.'s personal history, as recited above, and included copies of N.H.'s medical records from ViewPoint along with the ViewPoint Report, wherein N.H. was

---

[117] *Id.*

[118] *Id.*

[119] *AR* at 44.

[120] *AR* at 20.

[121] *AR* at 23–27.

[122] *AR* at 23–24.

[123] *AR* at 27–33.

given a provisional diagnosis of attenuated psychosis.[124]  The only medical records provided

aside from these documents were the 2015 psychological exam.[125]  Also included in the appeal

were: (1) a school transcript from 2016–2017 with no mention of the incident leading to

expulsion; (2) a transcript from the boarding school in 2017–2018 documenting N.H.'s declining

grades; (3) N.H.'s accommodated learning plan; (4) a letter from Dr. Connolly about "Anthem

Psychiatric Disorder criteria," and discussing residential treatment criteria generally, focusing on

the criteria utilized by a health insurer under a patient's plan, but not identifying any specific

patient; (4) a June 2015 application for N.H.'s enrollment at a different residential treatment

program, recounting N.H.'s hospitalizations for suicidal ideation and an incident where he was

violent with a friend; (5) various generic resources such as a definition of attenuated psychosis,

ERISA rules, and Plan documents.[126]

On January 3, 2019, BCBS upheld its denial of N.H.'s claim for treatment at

ViewPoint.[127]  The denial letter indicated the appeal and medical records had been reviewed by a

board-certified psychiatrist who had not been involved with the prior denial.[128]  The given

rationale was:

> Per the medical necessity provision of your benefit plan, a medical necessity review
> has been completed.  Based on the clinical information provided, you did not meet
> MCG Residential Acute Behavioral Health Level of Care (Child/Adolescent)
> Guidelines for the following reasons: You were not a danger to yourself.  You were
> not a danger to others.  You were not having thoughts to harm yourself.  You were
> not aggressive or violent.  You were able to care for daily self-care needs.  From
> the clinical evidence, you could have been safely treated in a less restrictive setting

---

[124] *AR* at 29–34, 78–139, 1229–1468.

[125] *AR* at 1194–1214.

[126] *AR* at 35–64, 1107–1228.

[127] *AR* at 233–240 (denial of Level I Appeal).

[128] *AR* at 233.

such as Mental Health Intensive Outpatient Program (IOP).   No medically necessary days were authorized.[129]

The letter informed M.Z. she could seek an additional appeal or request an external review with an independent review organization.[130]

<em>ii.    Level-Two Appeal</em>

M.Z. submitted a second appeal on June 27, 2019, again challenging the denial of benefits for N.H.'s stay at ViewPoint.[131]  The Level II appeal contained no new information or records.  Instead, it reiterated the arguments made on the first appeal and included the same attachments.[132]

On July 5, 2019, BCBS again upheld the denial of benefits for Viewpoint.[133]  An independent psychiatrist with no prior involvement in the benefits determination evaluated the appeal and related medical records before denying the claim.[134]  The stated reason for denial was:

> Based on the information provided, the member did not meet Blue Cross Blue Shield of Illinois (BCBSIL) Milliman Care Guidelines (MCG) . . . Residential Acute Behavioral Health Level of Care, Child or Adolescent (B-902-RES), 20th Edition for the following reasons: The member was not having thoughts to harm himself.  The member did not harm himself.  The member did not need 24 hour care.  The member did not want to take medicine.  The member was doing well without medicine.  The member had good support.  From the information provided, the member could have been safely treated in a different setting such as Mental Health Intensive Outpatient.  No medically necessary days were authorized.[135]

---

[129] *AR* at 234.

[130] *AR* at 237–38.

[131] *AR* at 1482.

[132] *Plaintiffs' MSJ* at 13; *Defendants' MSJ* at 13.

[133] *AR* at 1490.

[134] *Id.*

[135] *AR* at 1491.

B. INNERCEPT

i. *Initial Denial and Level-One Appeal*

BCBS denied N.H.'s treatment at Innercept for a variety of reasons, through multiple Explanations of Benefits mailed to M.Z.[136]  Reasons for the denial included: (1) no supporting medical records were provided, (2) the services rendered were excluded by the Plan, and/or (3) claims were not timely submitted.[137]  In an appeal dated March 27, 2020, M.Z. submitted medical records and requested review of the benefits denial.[138]  A fax cover sheet shows the appeal was transmitted to BCBS on April 6, 2020.[139]  During this litigation, Plaintiffs submitted documentation showing the appeal was sent via overnight mail to the designated appeals address on March 27, 2020, and received by signature on March 30, 2020.[140]  BCBS marked the appeal as received on April 8, 2020.[141]  Consequently, BCBS denied the appeal as time-barred because it was submitted more than 180 days after the initial denial date of October 5, 2019.[142]

After conferring with BCBS's denial management team, M.Z. decided to withdraw her appeal, choosing instead to submit medical records on the claims denied for lack of documentation and allow for an initial determination on the merits.[143]  Upon receiving the medical records, BCBS again denied the claims in a series of Explanations of Benefits, but for three new reasons: (1) no medical necessity, (2) boarding school services were excluded by the

---

[136] *AR* at 1531–1542; *see also* Dkt. 43-4.

[137] *AR* at 1531–1542; *see also* Dkt. 43-4.

[138] *AR* at 1520, 1525, 1543–2806.

[139] *AR* at 1525.

[140] Dkt. 57-1.

[141] *AR* at 1.

[142] *AR* at 1–6.

[143] *AR* at 2540, 4147.

Plan, and (3) Innercept Academy was out-of-network and Plaintiffs did not receive preauthorization.[144]

        ii.   *Level-Two Appeal*

BCBS has no record of receiving a Level II appeal for the denial of benefits on the Innercept stay.[145]  Consequently, BCBS never made a final determination on the Innercept claim.

## IV.    Procedural History

Plaintiffs filed a Complaint on December 22, 2020.[146]  The Complaint includes two claims against Defendants: (1) recovery of benefits under ERISA 29 U.S.C. § 1132(a)(1)(B), and (2) violation of the Mental Health Parity and Addiction Equity Act 29 U.S.C. § 1132(a)(3).[147]

In preparing for this litigation, Defendants provided Plaintiffs with the administrative record.[148]  At that time, Plaintiffs discovered the record contained no Level II appeal for Innercept.[149]  The parties conferred via email and phone to discuss the completeness of the record.[150]  Although Defendants had no record of receiving a Level II appeal for Innercept, Plaintiffs had shipping receipts showing the appeal was sent overnight to a BCBS corporate post office box and signed for on July 1, 2020.[151]  The mail supervisor for BCBS reviewed the mail logs and confirmed BCBS had no record of any mailings being received in the denials

---

[144] Dkt. 43-5.

[145] Dkt. 44.

[146] Dkt. 2.

[147] *Complaint* at 22.

[148] Dkt. 37; *Plaintiffs' Motion to Supplement the Pre-Litigation Appeal Record* (*Motion to Supplement*) at 2.

[149] *Motion to Supplement* at 2.

[150] *Id.* at 2–3.

[151] *Motion to Supplement* at 6; *see also* Dkt. 37-4 (Shipping Receipts for Innercept Level II Appeal).

department on or around July 1, 20202.[152]  The supervisor also noted there was a discrepancy in the mailing zip codes.[153]

BCBS then offered to send the Innercept Level II appeal to an independent reviewer for a determination on the merits of the claim for benefits.[154]  Plaintiffs declined the offer, opting to resolve the issue in litigation.[155]  Plaintiffs then filed a Motion with this court to supplement the record to include the Level II Innercept appeal mailed by M.Z., which Magistrate Judge Cecilia Romero granted on August 4, 2022.

On May 27, 2022, both parties filed Motions for Summary Judgment.[156]  Plaintiffs attached their mailed Level II Innercept appeal as an exhibit to their Motion.[157]  The Level II appeal contained BCBS's Explanations of Benefits denying coverage for Innercept, along with 1500 pages of medical records from Innercept.[158]  After briefing was complete, the court held a hearing on November 15, 2022.  The Motions, having been fully briefed and aided by oral argument, are now ripe for review.

## LEGAL STANDARD

Summary judgment is appropriate if the moving party establishes "there is no genuine issue as to any material fact" and it is "entitled to judgment as a matter of law."[159]  Usually, on a motion for summary judgment, the evidence and reasonable inferences are viewed in a light

---

[152] Dkt. 44 at 2.

[153] *Id.*

[154] Dkt. 37-3 at 3–4 (emails between counsel).

[155] *Id.*

[156] Dkt. 40, *Defendants' MSJ*; Dkt. 42, *Plaintiffs' MSJ.*

[157] Dkt. 38-17.

[158] Dkt. 38-17 at 151.

[159] Fed. R. Civ. P. 56(a).

favorable to the nonmoving party.[160]  But because this is an ERISA case where both parties moved for summary judgment, "the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[161]

However, the moving party does still carry "the burden of showing beyond a reasonable doubt that it is entitled to summary judgment."[162]  And if the moving party also carries the burden of persuasion at trial, "a more stringent summary judgment standard applies."[163]  To obtain summary judgment in such circumstances, "the moving party must establish, as a matter of law, all essential elements of the issue."[164]  The defendant is then "obligated to bring forward any specific facts alleged to rebut the movant's case."[165]  Where the moving party does not carry the burden of persuasion at trial, to obtain summary judgment it need only produce evidence negating an essential element of the non-movant's claim or show the nonmovant lacks evidence to establish its claim.[166]

Finally, in reviewing cross-motions for summary judgment, the court must evaluate each motion separately—"the denial of one does not require the grant of another."[167]

---

[160] *See N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[161] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation omitted).

[162] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal citations and quotation marks omitted).

[163] *Id.*

[164] *Id.* (internal citations and quotation marks omitted).

[165] *Id.*

[166] *Id.*

[167] *Bluell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 434 (10th Cir. 1979).

## ANALYSIS

There are two causes of actions at issue in the parties' cross-motions for summary judgment: (1) a claim for wrongful denial of benefits under ERISA, and (2) a claim for violation of the Parity Act.[168]  The court addresses each in turn.

### I.   Denial Of Benefits

ERISA allows plan participants to seek judicial review of an administrative denial of health benefits under 29 U.S.C. § 1132(a)(1)(B).  But ERISA "does not specify the standard of review that courts should apply."[169]  The Supreme Court has directed that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[170]  Where such discretion is granted, the court applies a more deferential standard of review, "asking only whether the denial of benefits was arbitrary and capricious."[171]  This deferential standard of review applies only if the administrator actually exercises its discretion in denying benefits.[172]  The party arguing for the more deferential standard of review bears the burden of establishing its applicability.[173]

BCBS argues both the ViewPoint and Innercept denials are afforded the arbitrary and capricious standard of review because BCBS properly exercised the discretion afforded it under the Plan.[174]  Plaintiffs acknowledge the Plan grants BCBS discretionary authority to determine

---

[168] *Complaint.*

[169] *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F. 3d 1311, 1315 (10th Cir. 2009).

[170] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[171] *LaAsmar*, 605 F.3d at 796.

[172] *Rasenack*, 585 F.3d at 1315.

[173] *LaAsmar*, 605 F.3d at 796.

[174] *Defendants' MSJ* at 17–20.

eligibility for benefits, but argue BCBS "forfeit[ed] access to the deferential" standard of review by "fail[ing] to comply with ERISA's procedural requirements."[175]  Because each benefits claim must be evaluated separately, the court will address the arguments for each facility independently, first determining the proper standard of review before turning to the merits of each claim for benefits.

A.  VIEWPOINT

i.  *Standard of Review*

Plaintiffs argue the ViewPoint claim should be reviewed de novo due to three procedural irregularities: (1) BCBS did not apply the Plan's terms to N.H.'s medical circumstances in explaining the bases for denial, (2) BCBS did not demonstrate it considered appeal materials in subsequent denials, and (3) BCBS did not engage in a meaningful dialogue with Plaintiffs concerning the denials.[176]  In response, BCBS argues it fully complied with ERISA's procedural regulations and the ViewPoint claim is subject to the arbitrary and capricious standard of review.[177]  BCBS is correct.

As noted, when a claims administrator is vested with discretionary authority to evaluate claims, as here, district courts review the denial of benefits under a deferential standard of review unless the denial was not a product of a valid exercise of discretion.[178]  ERISA regulations provide that a Plan administrator does not properly exercise its discretion when it denies benefits without complying with statutory procedural requirements.[179]  If an administrator commits

---

[175] *Plaintiffs' MSJ* at 22, 28.

[176] *Id.* at 26–27.

[177] Dkt. 59, *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment* (*Defendants Opp.*) at 10–12; *Defendants' MSJ* at 17–19.

[178] *See, e.g.*, *Rasenack*, 585 F.3d at 1315.

[179] *See* 29 C.F.R. § 2590.715-2719(b)(2)(F)(1).

"serious procedural irregularities" in contravention of ERISA regulations, the court applies "de novo review where deferential review would otherwise be required."[180]

However, not all procedural irregularities merit de novo review.  De minimis violations in the claims process that occur "in the context of an ongoing, good faith exchange of information between the plan and the claimant" do not trigger de novo review.[181]  What constitutes a de minimis procedural violation under present ERISA regulations is an open question within the Tenth Circuit.[182]  Under a prior version of ERISA, the Tenth Circuit Court of Appeals held de novo review applied only if the administrator did not "substantially comply with ERISA regulations" in the benefit-determination process.[183]  The Court of Appeals has yet to decide whether the substantial compliance rule still applies under the amended ERISA regulations, allowing only de minimis procedural violations.[184]  But because Plaintiffs  have not shown BCBS breached ERISA procedures on the ViewPoint claim, that question need not be answered here.

Plaintiffs first argue BCBS violated ERISA procedures by failing to apply the Plan terms to N.H.'s medical circumstances in explaining its bases for denial.[185]  In support, Plaintiffs quote a line from BCBS's second denial letter, "[N.H.] was not violent," and assert BCBS made only broad generalizations in denying the ViewPoint claim.[186]  As relevant here, when denying

---

[180] *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[181] 29 C.F.R. § 2590.715-2719(b)(2)(F)(2).

[182] *LaAsmar,* 605 F.3d at 800 n.7 ("[W]e left open the question of whether the 'substantial compliance' rule remains applicable under the revised 2002 ERISA regulations.").

[183] *See Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1152 (10th Cir. 2009).

[184] *See id.* at 1152 n.3 ("Because Ms. Hancock has failed to show any noncompliance, we need not consider whether substantial compliance is sufficient under the January 2002 revisions of ERISA."); *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 827–28 (10th Cir. 2008); *see also LaAsmar*, 605 F.3d at 800.

[185] *Plaintiffs' MSJ* at 26 (quoting *AR* at 1491).

[186] *Plaintiffs' MSJ* at 26.

benefits based on medical necessity, ERISA regulations require plan administrators to provide the claimant with "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances."[187]   BCBS denied ViewPoint coverage under the Plan's medical necessity provision and explained that N.H. did not meet the MCG requirements for residential treatment.[188]   Broadly speaking, the MCG authorize residential behavioral treatment in cases where a participant is either a danger to self, danger to others, or suffers a behavioral health disorder with serious dysfunction in daily life.[189] The ViewPoint denial letters each point to the following facts to show why N.H.'s circumstances do not meet the Plan terms:

- N.H. had no suicidal ideation and no self-injurious behavior.

- N.H. had no thoughts to harm others and was not engaging in violent or aggressive behavior.

- N.H. was able to care for himself.[190]

These facts correspond with each of Defendants' clinical requirements for medical necessity. While Plaintiffs disagree with BCBS's conclusion, asserting "N.H. was obviously violent," and pointing to record evidence to support this conclusion,[191] "there is not a serious procedural irregularity requiring de novo review every time 'the plan administrator's conclusion is contrary to the result desired by the claimant.'"[192]   Here, there is no procedural irregularity.   The denial letters complied with ERISA by providing an explanation of the guidelines used for the benefit

---

[187] *See* 29 C.F.R. 2560.503-1(g)(1)(v)(B).

[188] *See AR* at 43, 234, 1491.

[189] *AR* at 1108.

[190] *AR* at 43, 234, 1491.

[191] *Plaintiffs' MSJ* at 26.

[192] *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1251 (D. Utah 2016) (quoting *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1214 n.2 (10th Cir. 2006)).

determination and applying those terms to N.H.'s circumstances.[193]  Plaintiffs' differing

interpretation of the underlying facts does not change this conclusion.

Next, Plaintiffs argue BCBS did not procedurally comply with ERISA because BCBS

failed to account for new information submitted on appeal.[194]  Specifically, Plaintiffs state the

denial letters offer "no reason to believe Defendants actually read the appeals," especially given

BCBS's conclusion that N.H. was nonviolent despite allegedly undisputed record facts to the

contrary.[195]  ERISA regulations afford claimants a "full and fair review" when they appeal

adverse benefit determinations.[196]  A full and fair review "takes into account all comments,

documents, records and other information submitted by the claimant relating to the claim."[197]  "It

does not, however, require the administrator to explicitly discuss the evidence submitted by the

claimant."[198]  Both ViewPoint denial letters note the appeals were reviewed by an independent

psychiatrist who evaluated the appeal and all the related medical records submitted with the

appeal.[199]  The denial letters indicate the information provided was used in making the

decision.[200]  Admittedly, the letters are similar, but this alone does not show BCBS failed to

conduct a full and fair review.  A more likely conclusion is that the denial letters are similar

---

[193] *See* 29 C.F.R. § 2560.503-1(g)(1)(v)(B).

[194] *Plaintiffs' MSJ* at 27.

[195] *Id*.

[196] 29 C.F.R. § 2560.503-1(h)(2).

[197] *Id*. § 2560.503-1(h)(2)(iv).

[198] *Ian C. v. United Healthcare Ins. Co.*, No. 2:19-cv-474, 2022 WL 3279860, at *7 (D. Utah Aug. 11, 2022) (emphasis omitted) (comparing 29 C.F.R. § 2560.503-1(h)(2), with 29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(i) which requires administrators of long-term disability claims to explain the basis for disagreeing with specific evidence); *see also Mary D. v. Anthem Blue Cross Blue Shield*, 778 F. App'x 580, 589 (10th Cir. 2019) (stating a full and fair review need only take into account submitted materials and there is no authority requiring a claims administrator to "affirmatively respond to these submissions" (emphasis omitted)).

[199] *AR* at 233, 1490.

[200] *AR* at 234, 1491.

because the Level II appeal contained no new information or records—it merely reiterated the arguments made on the first appeal and included the same attachments.[201]  Accordingly, the court finds Plaintiffs have failed to establish procedural irregularity on this basis.

Finally, Plaintiffs argue BCBS committed a procedural violation by failing to engage in meaningful dialogue with Plaintiffs concerning the denials.[202]  The meaningful dialogue requirement stems from § 2560.503-1(g) and (h) of the ERISA regulations, which require administrators to explain their denial decision and adequately consider evidence submitted in appeals.[203]  "Together, these requirements enable claimants to submit informed responses to the adverse decision and to engage in meaningful dialogue with the plan administrator."[204]  As discussed, BCBS adequately explained its denials by citing the MCG and listing the corresponding facts.  And BCBS stated it considered all the evidence submitted for both ViewPoint appeals.[205]  In other ways, Defendants also engaged in meaningful dialogue by communicating with M.Z. beyond the denial letters.  For example, on January 3, 2019, BCBS spoke with M.Z. via phone, informing her of its decision on her appeal and providing information about the next level of appeal.[206]  Thus, as to their claim that there was no meaningful dialogue, Plaintiffs essentially restate their prior procedural irregularity arguments without pointing to additional facts to support this contention.[207]  Accordingly, this argument also fails.

---

[201] Dkt. 42, *Plaintiffs' Motion for Summary Judgment* (*Plaintiffs' MSJ*) at 13; *Defendants' MSJ* at 13.

[202] *Plaintiffs' MSJ* at 26–27.

[203] *See Metzger v. UNUM Life Ins. Co. of Am.*, 476 F.3d 1161, 1168 n.4 (10th Cir. 2007).

[204] *Id.*

[205] *AR* at 233–34, 1490–91.

[206] *AR* at 1469.

[207] *Plaintiffs' MSJ* at 27–28.

Because the Plan grants BCBS discretion in reviewing claims, and finding no procedural irregularity, Defendants are entitled to the deferential arbitrary and capricious standard of review on the ViewPoint claim.

ii.  *Benefits*

"Under arbitrary and capricious review, this court upholds [BCBS's] determination so long as it was made on a reasonable basis and supported by substantial evidence."[208]  Substantial evidence "mean[s] more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion."[209]  The court reviews the record as a whole to determine whether substantial evidence exists to support the rationale for denial, accounting for all record facts including those which detract from the administrator's decision.[210]  A benefits determination is upheld if, given the evidence in the record, "the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end."[211]  Only decisions "not grounded on *any* reasonable basis" are arbitrary and capricious.[212]  The claimant bears the burden of establishing coverage.[213]  Here, Plaintiffs have not established the ViewPoint claim is covered, even considering the record de novo,[214] because Plaintiffs fail to identify record evidence demonstrating medical necessity.

---

[208] *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

[209] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (citation and quotation marks omitted).

[210] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).

[211] *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (citations and quotations omitted).

[212] *Id.* (citation and quotation omitted).

[213] *See McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992) ("It is a basic rule of insurance law that the insured carries the burden of showing a covered loss has occurred . . . ."); *Lunt v. Metro. Life Ins. Co.*, No. 205-cv-784 TC, 2007 WL 1964514, at *11 (D. Utah July 2, 2007).

[214] "When applying a de novo standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision."  *Niles v. Am. Airlines, Inc.*, 269 F. App'x 827, 832 (10th Cir. 2008) (quoting *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

The Plan covers "medically necessary" mental health services.[215]  To determine whether residential mental health treatment is medically necessary, BCBS uses MCG admission criteria.[216]  The MCG require at least one of the following for around-the-clock mental health treatment: (1) Danger of serious harm to self, (2) Danger of serious harm to others, or (3) Daily (or near daily) moderately severe psychiatric or behavioral symptoms accompanied by serious dysfunction in daily living.[217]  BCBS denied benefits for N.H.'s stay at ViewPoint after finding it was not medically necessary because none of the three MCG admission guidelines were present.[218]  Plaintiffs argue "N.H.'s symptoms handily met the internal criteria" and BCBS erred. The court disagrees.

First, the record facts support N.H. was not at risk of serious harm to himself.  Pointing to the prior month where N.H. ran away over spring break and at the Oregon program, Plaintiffs argue N.H.'s "tendency to abscond from adult supervision demonstrates that he was a danger to himself," especially given his mental health history.[219]  Credible evidence supports the opposite conclusion.  The Plan considers harm serious "if it has a substantial likelihood of causing death, disability, or major disfigurement."[220]  The ViewPoint admitting nurse classified N.H. at "Mild Risk" for self-harm (with the options being No Risk, Mild Risk, Moderate Risk, and High Risk) due to a few risk factors in N.H.'s history.[221]  From the day of entry to his discharge, there were no reports of any self-harm incidents or concerns during N.H.'s stay.  N.H. consistently denied

---

[215] *AR* at 420.

[216] *AR* at 205, 396.

[217] *AR* at 396–97.

[218] *AR* at 234, 1491.

[219] *Plaintiffs' MSJ* at 29.

[220] *AR* at 384.

[221] *AR* at 856.

thoughts of self-harm or having any inclination to run.[222]   Indeed, N.H.'s therapist found N.H.'s

behavior to be "reassuring," opining N.H.'s continued disavowal of self-harm was "likely an

accurate report."[223]   After telling N.H. that he would prescribe medication if N.H. posed an

immediate threat to himself, the therapist never found it necessary to do so.[224]   And M.Z. stated

N.H. had never attempted suicide.[225]   Even crediting other facts in the record, such as N.H.'s

prior hospitalizations for suicidal ideation and past incidents of running away, Plaintiffs have not

demonstrated N.H.'s behavior at ViewPoint as a whole presented "a substantial likelihood of

causing death, disability, or major disfigurement" to himself.   BCBS's determination that N.H.

did not want to harm himself relied on the well-detailed reports from ViewPoint indicating N.H.

consistently denied thoughts of self-harm and his therapist confirming N.H.'s reports.   The

events Plaintiffs point to occurring prior to the ViewPoint stay do not render these more

contemporaneous medical opinions unsupported.

    Likewise, there is ample support in the record for BCBS's finding that N.H. did not

present a serious danger to others.   On this point, Plaintiffs cite to prior incidents where N.H.

attacked M.Z., threatened her (including placing his hands around her throat), and was expelled

from school for punching a classmate.[226]   But the ViewPoint records offer a different picture.

According to those, N.H. harbored no assaultive ideation when admitted to ViewPoint, he

---

[222] *AR* at 73, 856; *see AR* at 707–708 (ViewPoint Psychotherapy Progress Notes, 4/24/18); *AR* at 90 (Therapist Notes 4/23/18 through 4/27/18); *AR* at 93 (ViewPoint Psychotherapy Progress Notes, 5/21-5/25); *AR* at 94 (ViewPoint Psychotherapy Progress Notes, 5/29-6/1); *see also AR* at 749 (ViewPoint Psychotherapy Progress Notes, 4/16/18); *AR* at 761 (ViewPoint Weekly Psychotherapy Notes 4/16-4/20); *AR* at 802–803 (ViewPoint Psychotherapy Progress Notes, 4/10/18); *AR* at 849 (ViewPoint Psychotherapy Progress Note, 4/4/2018).

[223] *AR* at 90.

[224] *AR* at 89, 94.

[225] *AR* at 937.

[226] *Plaintiffs' MSJ* at 29.

followed most program expectations, and overall his behavior was "nonproblematic."[227]   There

were only two documented occasions noted where N.H. was upset or angry at Viewpoint—once

during a group call with his parents and once when he elbowed another resident in gym.[228]

Notwithstanding these relatively minor incidents, N.H. never posed a threat requiring his

therapist to implement chemical intervention.[229]   Plaintiffs have not identified any evidence of

seriously dangerous behaviors N.H. exhibited toward others during his stay at ViewPoint, or in

the months directly prior to admission.   The record in total simply does not show that N.H. was a

danger to others at the time he entered and was treated at ViewPoint.   Plaintiffs therefore fail to

establish medical necessity on this basis.

Finally, N.H. does not meet the third medical necessity criterion because record evidence

does not establish N.H. suffered from a moderately severe psychiatric or behavioral disorder

with daily (or near daily) symptoms accompanied by serious dysfunction in daily living.   To

meet their burden, Plaintiffs argue N.H.'s diagnosis with attenuated psychosis, coupled with his

other mental health disorders, qualify as a moderately severe disorder.[230]   And Plaintiffs argue

N.H.'s declining grades in school, episodes of running away, and reports of paranoid ideation

demonstrate he was experiencing serious dysfunction in daily living.[231]   As an initial matter, the

record reveals N.H. was given only a "provisional" diagnosis for attenuated psychosis after his

admission.[232]   When N.H. was admitted, Nurse Crookston did not diagnose him with a severe

---

[227] *AR* at 121, 849.

[228] *AR* at 90, 92.

[229] *AR* at 89 ("Informed [N.H.] that I would not force him to take medications, unless he poses an immediate threat to himself or others in such a way that absolutely warrants implementation of chemical intervention.").

[230] *Plaintiffs' MSJ* at 30.

[231] *Id.*

[232] *AR* at 108, 123.

disorder.[233]  The ViewPoint Report issued later indicated "the direction of [N.H.'s] symptoms remains unclear; we do not yet know whether his attenuated/ebbing/flowing pattern of confusion, withdrawal, semi-delusional symptoms are indicative of a psychotic prodrome, eventual emergence of bipolar disorder, manifestation of previously suppressed posttraumatic stress."[234] Even assuming that a provisional diagnosis qualifies as a moderately severe psychiatric disorder, N.H. did not suffer from daily or near daily symptoms associated with this disorder.  During the course of his stay at ViewPoint, N.H. consistently denied having delusions and hallucinations.[235] The ViewPoint Evaluation stated, "there was no evidence during any of the interactions that [N.H.] was responding to internal stimuli or experiencing any psychotic thought processes."[236] Only twice during the nearly two-month stay did therapy notes reflect concern over internal stimuli or unstable thought patterns.[237]  After one incident, N.H.'s therapist expressed concern that medication may be necessary.[238]  But on the whole, N.H. presented well enough that ViewPoint providers never found it necessary to prescribe medication.[239]

Additionally, N.H. never showed serious dysfunction in daily living.  Serious dysfunction is indicated by: (1) serious or significant interpersonal issues, (2) a consistent failure to manage self-care, (3) inability to perform in school due to disruptive or aggressive behavior, (4) disturbance in physical functioning (sleeping and eating schedule), or (5) a severe inability to

---

[233] *AR* at 76.

[234] *AR* at 94.

[235] *AR* at 73, 93.

[236] *AR* at 111.

[237] *AR* at 91 (Therapist Notes 4/30/18 through 5/4/18; Therapist Notes 5/7/18 through 5/11/18).

[238] *AR* at 91 (Therapist Notes 5/7/18 through 5/11/18) ("[T]he indication to implement medication is . . . becoming more critical.").

[239] *AR* at 94 ("[N.H.'s] presentation continues to reside as sub-threshold for justification of forced implementation of medication.").

assess consequences as exhibited by destructive behaviors or other similar acts.[240]  Plaintiffs

argue N.H. met these criteria because he struggled in school, ran away from supervision, and

reported paranoid ideation.[241]  Although N.H.'s grades were declining prior to his admission at

ViewPoint, there is no evidence this was due to disruptive or aggressive behavior.[242]  In fact,

N.H.'s teachers mostly attributed his declining grades to repeated absences, his learning

disabilities, and a lack of effort.[243]  More importantly, there are no serious dysfunctions in daily

life found in ViewPoint records during the date range for which coverage is in question.  Daily

staff notes indicate N.H. mostly followed program expectations.[244]  The ViewPoint Report

concluded "N.H.'s behavior at ViewPoint was nonproblematic" and N.H. had been "friendly and

pleasant to work with."[245]  Even crediting M.Z.'s conflicting behavioral reports from before

N.H.'s admission, Plaintiffs' have failed to show why those incidents should override

contemporaneous reports from treatment providers during the relevant time period.  ViewPoint

records do not show N.H. suffered from a severe disorder with daily symptoms and serious

dysfunction in daily life.  Thus, Plaintiffs cannot meet the third criterion to establish residential

treatment at ViewPoint was medically necessary.

     Plaintiffs alternatively quote case law holding a benefits denial is arbitrary and capricious

when the administrator fails to cite plan language or medical records in its denial letter.[246]  But

---

[240] *AR* at 397.

[241] *Plaintiffs' MSJ* at 30.

[242] *AR* at 1222–28.

[243] *Id.*

[244] *AR* at 687 (Viewpoint Center Daily Note 4/26/18); *see also AR* at 693 (Viewpoint Center Daily Note 4/25/18); *AR* at 701 (Viewpoint Center Daily Note 4/24/18 Swing Shift); *AR* at 703 (Viewpoint Center Daily Note 4/24/18 Day Shift); *AR* at 710 (ViewPoint Center Daily Note 4/23/18).

[245] *AR* at 121, 123.

[246] *Plaintiffs' MSJ* at 32–33.

Plaintiffs never really explain how this case law applies to their denial letters.[247]  Plaintiffs do

not actually argue the denial letters are deficient.[248]  Rather, they disagree with the conclusions

the letters reach and cite selected conflicting facts they believe establish coverage under the

Plan.[249]  Thus, this alternative argument does not provide a basis to overturn BCBS's benefits

decision either.

Based on the court's review of the administrative record, substantial evidence supports

BCBS's finding that N.H.'s symptoms did not meet the three medical necessity criteria during

his stay at ViewPoint.  Plaintiffs have not pointed to any deficiencies sufficient to warrant

reversal under an arbitrary and capricious standard.  Moreover, under even de novo review, the

court concludes BCBS made a correct benefits decision based on the Plan language and its use of

MCG to assess medical necessity.  Accordingly, on the claim for Viewpoint benefits, Plaintiffs

are denied summary judgment and Defendants are granted summary judgment.

B.   INNERCEPT

i.  Standard of Review

As to the Innercept claim, Plaintiffs argue that decision is subject to de novo review

because BCBS violated ERISA's procedural requirements by failing to respond to M.Z.'s

appeal.[250]  Defendants raise four alternative arguments in response: (1) the court should

summarily affirm the denial of all untimely Innercept claims; (2) the Innercept claim should be

reviewed under an arbitrary and capricious standard because BCBS had no obligation to review

the time-barred claims; (3) the court should remand the Innercept claim to BCBS to complete the

---

[247] *Id.*

[248] *Id.*

[249] *Id.* at 33.

[250] *Id.* at 27.

administrative review process; and (4) the Innercept claim should be reviewed de novo to allow for consideration of the entire record and arguments, rather than limiting BCBS to the denial rationale articulated in the Explanations of Benefits.[251]   Under the circumstances presented and the governing case law, the court concludes remand is warranted.

As laid out above, an ERISA benefits determination is normally reviewed under one of two standards: arbitrary and capricious review (when the administrator is vested with discretion to review claims and properly exercises that discretion) or de novo review (when either the administrator is not afforded discretion or fails to properly exercise its discretion through serious procedural irregularities or otherwise).[252]   But there are also cases that do not fit into either category.[253]   In cases where the administrative process is interrupted midstream due to unintentional procedural irregularities rather than the parties' conduct, leaving an incomplete and inconclusive administrative record, remand is the best option to allow for a benefits determination on the merits and to create a complete record for judicial review.[254]

In *Messick v. McKesson Corp.*, a claimant sought judicial review after receiving no determination on his level-one appeal.[255]   During litigation, the claimant discovered the administrator had denied the claim but the decision got lost in the mail.[256]   The claimant initially argued for de novo review, asserting the administrator's addressing error constituted a serious

---

[251] *Defendants' MSJ* at 20–22; *Defendants' Opp.* at 13–15.

[252] *See LaAsmar*, 605 F.3d at 797; *Gilbertson*, 328 F.3d at 635.

[253] *See Benedetti v. Schlumberger Tech. Corp.*, No. CIV-18-614-R, 2020 WL 61048, at *4–6 (W.D. Okla. Jan. 6, 2020) (finding based on the incomplete record that the case did not fit "squarely into either" de novo or abuse of discretion review and remanding to complete the administrative record).

[254] *See Messick v. McKesson Corp.*, 640 F. App'x 796 (10th Cir. 2016); *see also Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121 (10th Cir. 2006) (remanding for reconsideration because provider was not given all relevant evidence prior to making a determination).

[255] 640 F. App'x at 797.

[256] *Messick*, 640 F. App'x at 797.

procedural error, but alternatively argued remand was appropriate.[257]   The district court affirmed

the denial under a less-deferential arbitrary and capricious standard of review.[258]   On appeal, the

Tenth Circuit Court of Appeals noted the "long recognized importance of completing the

administrative review process," and remanded the case to allow the administrator to review the

appeal on the merits.[259]   The court distinguished cases where the administrator deliberately

terminates the administrative review process from the facts before it, where the administrative

process had been cut off midstream.[260]   In the former, the court has "a complete record upon

which to conduct de novo review."[261]   The latter presents an incomplete administrative record,

putting a reviewing court in a "poor position to evaluate" the claim.[262]   The *Messick* court

explained that "[p]remature judicial interference with the interpretation of a plan would impede

those internal processes which result in a completed record of decision making for a court to

review."[263]   Remanding the case to the administrator better serves ERISA policies by allowing

for "an ongoing, good faith exchange of information between the administrator and the

claimant."[264]

    In contrast, remand is not warranted where the plan administrator "had its chance to

exercise its discretion and it failed to do so in accordance with the clear guidelines of the Plan

and ERISA."[265]   In those circumstances, de novo review is appropriate because the administrator

---

[257] *Id.*

[258] *Id.* at 797–98.

[259] *Id.* at 797–99.

[260] *Id.* at 798.

[261] *Id.*

[262] *Id.* at 798–99.

[263] *Id.* at 799 (quoting *McGraw v. Prudential Ins. Co. of Am.*, 137 F. 3d 1253, 1263 (10th Cir. 1998)).

[264] *Id.* (quoting *Gilbertson*, 328 F.3d at 635).

[265] *Rasenack*, 585 F.3d at 1327.

"ceased participating in a meaningful dialogue with" the claimant,[266] and is therefore "not entitled to the protections concerning administrative review."[267]

The facts here support remand. First, the administrative process was cut off by procedural irregularities not caused by Defendants. BCBS never issued a determination on a Level I Innercept appeal because M.Z. withdrew it to allow BCBS time to review newly submitted medical records.[268] And BCBS never addressed the Level II appeal because it did not receive the mailing.[269] While Plaintiffs assert BCBS lost the appeal, they have no evidence to support this assertion. And Plaintiffs concede that summer of 2020 was a challenging time due to the then-raging COVID-19 pandemic and it is "not surprising" the appeal materials were lost.[270] Because BCBS mail logs confirm they have no record of receiving the Level II appeal, the facts establish procedural irregularities denied Defendants the opportunity to review a Level II appeal on the Innercept claim.

Second, the administrative record is incomplete, leaving the court in a poor position to evaluate BCBS's denial of coverage on the Innercept claim. BCBS initially denied the claims summarily without the benefit of medical records.[271] After M.Z. had provided the records, BCBS denied the claims in a series of Explanations of Benefits with generic codes explaining the reasons for denial.[272] Due to the procedural irregularities, the administrator never had the opportunity to evaluate the Level II appeal with the accompanying records, nor did BCBS ever

---

[266] *See Gilbertson*, 328 F.3d at 636.

[267] *VanderKlok v. Provident Life & Accidental Ins. Co.*, 956 F.2d 610, 617 (6th Cir. 1992), *cited with approval in Rasenack*, 585 F.3d at 1327.

[268] *AR* at 2540.

[269] Dkt. 44 at 2.

[270] *Plaintiffs' Opp.* at 18, 27.

[271] *AR* at 1531–1542; *see also* Dkt. 43-4.

[272] Dkt. 40-5.

articulate a denial that applied the Plan terms to N.H.'s circumstances.  Thus, on this record as

currently constituted, the court is unable to analyze the reasonableness of the benefits

determination.

For these reasons, the court remands the Innercept claim to BCBS to review the Level II

administrative appeal in the first instance.

## II.   PARITY ACT

The Parity Act requires healthcare providers to ensure treatment limitations applicable to

mental health benefits "are no more restrictive than the predominant treatment limitations

applied to substantially all medical and surgical benefits covered by the plan."[273]  "Congress

enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental

health and substance use disorders as compared to coverage for medical and surgical conditions

in employer-sponsored group health plans."[274]

A provider offering both mental health and medical/surgical benefits violates the Parity

Act by imposing more restrictive treatment limitations to mental health benefits than those

placed on analogous medical/surgical benefits.[275]  Federal regulations identify two types of

treatment limitations—quantitative and nonquantitative—but only nonquantitative limitations are

at issue here.[276]  To comply with the Parity Act, nonquantitative mental health treatment

limitations must utilize "processes, strategies, evidentiary standards, or other factors" that "are

comparable to, and are applied no more stringently than, the processes, strategies, evidentiary

---

[273] 29 U.S.C. § 1185a(a)(3)(A)(ii).

[274] *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016).

[275] 29 C.F.R. § 2590.712(c)(2)(i).

[276] 29 C.F.R. § 2590.712(a); *see Defendants' MSJ* at 25 ("The nonquantitative treatment limitation [is] at issue in this case . . . ."); *Plaintiffs' Opp.* at 26 (lodging no objection to the characterization of the disputed limitation as nonquantitative).

standards, or other factors" used to determine treatment limitations on analogous medical/surgical benefits.[277]

In reviewing a Parity Act claim, the court affords no deference to a benefits administrator,[278] examining "the plan documents as a whole" to determine whether treatment limitations violate the Parity Act.[279]  While the Tenth Circuit has not spoken on what is required to state a claim under the Parity Act,[280] courts in this district typically apply either a three- or four-part test to analyze claims.[281]  Because the tests are "materially indistinguishable, prompting only slightly different versions of the same basic question," and Plaintiffs have not objected to the three-part test, the court will apply the three-part test in evaluating Plaintiffs' Parity Act claim.

Under that test, to establish a Parity Act claim a plaintiff must:

(1) identify a specific treatment limitation on mental health benefits; (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits; and (3) plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog.[282]

Only the third element is in dispute here.  The parties agree medical necessity is a treatment limitation for residential mental health care, and that the Plan covers both mental

---

[277] 29 C.F.R. § 2590.712(c)(4)(i).

[278] *Joseph F.*, 158 F. Supp. 3d at 1258 (explaining that deciding a Parity Act claim is a matter of interpreting a statute, which is a legal question afforded no deference).

[279] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1011 (10th Cir. 2008) ("[A]s the first step towards interpreting an ERISA plan, we scrutinize the plan documents as a whole and, if unambiguous, construe them as a matter of law." (internal citations and quotations omitted)).

[280] *Johnathan Z. v. Oxford Health Plans*, No. 2:18-cv-383-JNP-PMQ, 2020 WL 607896, at *13 (D. Utah Feb. 7, 2020) ("[T]he Tenth Circuit has not promulgated a test to determine what is required to state a claim for a Parity Act violation . . . .").

[281] *Nathan W. v. Anthem Bluecross Blueshield of Wisc.*, No. 220-cv-00122-JNP-JCB, 2021 WL 842590, at *6 (D. Utah Mar. 5, 2021).

[282] *Id.*

health care and analogous medical/surgical care.[283]  Additionally, for the purposes of their

Motions, the parties agree that skilled nursing facilities, inpatient rehabilitation, and inpatient

hospice treatment are analogous to residential mental health treatment.[284]  Thus, the question

presented is whether the Plan sets disparate medical necessity limitations for residential mental

health care as compared to the identified medical/surgical analogs.[285]

The Plan uses MCG criteria to determine the medical necessity of both medical/surgical

care and mental health treatment.[286]  Plaintiffs argue the MCG criteria for residential mental

health treatment impose more restrictive limitations on coverage than the MCG criteria for

analogous medical/surgical care and identify specific limitations they assert violate the Parity

Act.[287]  The court addresses each in turn.

### A.  ACUTE CARE LIMITATION

Plaintiffs first argue the Plan "explicitly imposes more stringent limitations" on

residential mental health treatment than the medical surgical analogs because residential mental

health services are listed as acute care (a more intensive level of care) while the medical surgical

analogs are subacute (less intensive care).  To support this argument, Plaintiffs point to where the

---

[283] *Plaintiffs' MSJ* at 34–35; *Defendants' MSJ* at 27 & n.14.

[284] *Plaintiffs' MSJ* at 35 & nn.123–125; *Defendants' MSJ* at 27 n.14.

[285] A plaintiff may bring either a "*facial* (as written in the language or processes of the plan) or *as-applied* (in operation via application of the plan)" challenge under the Parity Act.  *Jeff N. v. United HealthCare Ins. Co.*, No. 2:18-cv-00710-DN-CMR, 2019 WL 4736920, at *3–4 (D. Utah Sept. 27, 2019).  While Plaintiffs do not identify whether they raise a facial or as-applied challenge, they target the language of the Plan in the Complaint and in their Motion, so the court construes it as a facial challenge.  *See Complaint* ¶ 74; *Plaintiffs' MSJ* at 35–38; *see Jeff N.*, 2019 WL 4736920, at *3 ("A claim for a facial Parity Act violation targets the language of the plan or the processes of the plan that implementing guidelines require to be applied in a nondiscriminatory manner." (internal quotation and citation omitted)).

[286] *See, e.g.*, *AR* at 3691.

[287] *Plaintiffs' MSJ* at 35–38.

MCG uses the label "Residential Acute Behavioral Health Level of Care" when explaining the medical necessity requirements for residential mental health treatment.[288]

But to allege a Parity Act violation on nonquantitative treatment limitations, a plaintiff must show the administrator actually uses more stringent "processes, strategies, evidentiary standards, or other factors."[289]  Though Plaintiffs allege there is a discriminatory limitation, they fail to identify any express limitation in the Plan's processes or strategies that imposes a more stringent acute-level standard of care as compared to subacute care for analogous medical/surgical care.[290]  There are no facts demonstrating the Plan language at issue represents a treatment limitation on mental health benefits more restrictive than for analogous medical/surgical benefits.  Indeed, the language cited seems merely a label for the section—not a substantive process, strategy, standard, or factor used in determining coverage.[291]  Further, as explained below, an assessment of the Plan's language reveals the treatment limitations for residential mental health care and analogous surgical/medical care are evaluated in a comparable manner.  Accordingly, the court finds no Parity Act violation on this basis.

## B. ADMISSIONS LIMITATIONS

Plaintiffs next argue the MCG admissions criteria for residential mental health care are more stringent than the admissions criteria for a skilled nursing facility in two ways.[292]  First, under the MCG, admission to a residential mental health facility is medically necessary if

---

[288] *Plaintiffs' MSJ* at 35–36; *see AR* at 1108.

[289] 29 C.F.R. § 2590.712(c)(4)(i) ("[A]ny processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health . . . benefits in the classification [must be] comparable to, and . . . applied no more stringently than, the processes, strategies, evidentiary standards, or other factored used in applying the limitation with respect to medical/surgical benefits in the classification.").

[290] *Plaintiffs' MSJ* at 35–36.

[291] *See AR* at 1108.

[292] *Plaintiffs' MSJ* at 36–37.

treatment is "not feasible at a lower level of care," whereas admission to a skilled nursing facility is medically necessary if it is "safer and more practical than attempting care at a lower level."[293] Second, MCG requires a patient's condition be likely to improve with care and likely to deteriorate without care before covering admission at a residential mental health facility.[294] To qualify for skilled nursing under MCG, services must "meet patient needs, promote recovery, and ensure medical safety."[295] Plaintiffs argue that proving treatment is "safer and more practical" is implicitly easier than proving treatment is "not feasible at a lower level of care."[296] Plaintiffs further argue that conditioning residential mental health treatment on a patient's improvement "places an additional hurdle" beyond that required for skilled nursing care.[297]

In response, Defendants argue the Plan complies with the Parity Act because it uses the MCG guidelines to evaluate the medical necessity for all care, and a side-by-side comparison demonstrates the residential mental health medical necessity requirements are not more stringent than analogous medical/surgical care.[298] Based on the language cited, Defendants are correct.

As noted, the Parity Act requires coverage limitations for mental health care be no more stringent than those for analogous medical/surgical care.[299] In other words, coverage limitations must be "comparable,"[300] with no material or significantly disparate limitations.[301] A plan "must

---

[293] *Compare AR* at 1108 (MCG admission guidelines for teen residential mental health treatment), *with AR* at 3691 (MCG admission guidelines for skilled nursing facility).

[294] *See AR* at 1108(MCG admission guidelines for teen residential mental health treatment).

[295] *See AR* at 3691 (MCG admission guidelines for skilled nursing facility).

[296] *Plaintiffs' MSJ* at 37.

[297] *Id.* at 36–37.

[298] *Defendants' Opp.* at 20–26; *Defendants' MSJ* at 25, 30–32.

[299] 29 C.F.R. § 2590.712(c)(4)(i).

[300] *Id.*

[301] *James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-cv-38, 2021 WL 2532905, at *18–20 (D. Utah June 21, 2021), *appeal dismissed* (Nov. 30, 2021).

43

apply the same standards to medical/surgical benefits and to mental health or substance use disorder benefits."[302]

It is a violation of the Parity Act for a plan to inconsistently apply professional evidence-based standards as a limitation to coverage.[303]  For example, a plan may not impose professional standards as a criterion to establishing medical necessity for residential mental health benefits but not for analogous medical/surgical care.[304]  A violation in that situation makes sense given the Parity Act prohibits mental health coverage limitations using more stringent "processes, strategies, evidentiary standards, or other factors."[305]

Yet where a plan consistently applies professional evidentiary standards to determine whether treatment is medically appropriate in comparable mental and medical/surgical contexts, there is no Parity Act violation.[306]

The federal regulations provide an example to illustrate this point:

Example. A plan generally covers medically appropriate treatments. For both medical/surgical benefits and mental health and substance use disorder benefits, evidentiary standards used in determining whether a treatment is medically appropriate (such as the number of visits or days of coverage) are based on recommendations made by panels of experts with appropriate training and experience in the fields of medicine involved. The evidentiary standards are applied in a manner that is based on clinically appropriate standards of care for a condition.[307]

---

[302] 29 C.F.R. § 2590.712(c)(2)(ii)(A).

[303] *M.S. v. Premera Blue Cross*, 553 F. Supp. 3d 1000, 1030–33 (D. Utah 2021).

[304] *Id.*

[305] 29 C.F.R. § 2590.712(c)(4)(i) ("[A]ny processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health . . . benefits in the classification [must be] comparable to, and . . . applied no more stringently than, the processes, strategies, evidentiary standards, or other factored used in applying the limitation with respect to medical/surgical benefits in the classification.").

[306] *Id*. § 2590.712(c)(4)(iii)(Example 4)(i)(Facts).

[307] *Id.*

The regulations conclude that, under these facts, a plan complies with the Parity Act "because the processes for developing the evidentiary standards used to determine medical appropriateness and the application of these standards to mental health . . . benefits are comparable to and are applied no more stringently than for medical/surgical benefits."[308]  This conclusion does not change "even if the application of the evidentiary standards does not result in similar numbers of visits, days of coverage, or other benefits utilized for mental health conditions . . . as it does for any particular medical/surgical condition."[309]  In other words, the Parity Act requires application of comparable standards and processes to determine coverage limitations—not comparable treatment under the respective standards.[310]

In this case, the Plan uses comparable processes and strategies to determine admissions for residential mental health care and a skilled nursing facility.  The Plan generally covers only "medically necessary" treatment for both mental health and medical/surgical care.[311]  Medically necessary treatment is defined in the Plan as:

- Required to diagnose or treat the patient's illness, injury, or condition, and the condition cannot be diagnosed or treated without it.
- Consistent with the symptoms or diagnosis and the treatment of the condition.
- The most appropriate service or supply that is essential to the patient's needs.
- Professionally and broadly accepted as the usual, customary, and effective means of diagnosing or treating the illness, injury, or condition.[312]

---

[308] *Id.* § 2590.712(c)(4)(iii)(Example 4)(ii)(Conclusion).

[309] *Id.*

[310] *Julie L. v. Excellus Health Plan, Inc.*, 447 F. Supp. 3d 38, 56–58 (W.D.N.Y. 2020) ("[T]he regulations demonstrate that there is no ERISA violation simply because the application of the same evidentiary standards results in different benefits or coverage between mental health, substance abuse, medical, or surgical conditions.").

[311] *AR* at 420.

[312] *Id.*

The Plan applies this language universally, for both mental and medical/surgical services.[313]

BCBS also utilizes the MCG criteria as an independent evidentiary standard to determine the medical necessity of admissions for both mental and medical/surgical treatment facilities.[314] The MCG are nationally recognized third-party guidelines specifying treatment recommendations based on industry research.[315] The medical necessity criteria for admissions varies in the MCG depending upon the type of service sought,[316] but the processes used to obtain these standards are the same—a panel of physicians reviews peer research and scholarly articles to create the MCG criteria.[317]

Under the applicable regulations, on these facts Defendants are in compliance with the Parity Act. The Plan uses the same medical necessity criteria for all types of care, and "because the processes for developing the [MCG] evidentiary standards used to determine medical appropriateness and the application of these standards to mental health . . . benefits are comparable to and are applied no more stringently than for medical/surgical benefits,"[318] there is no violation.

Plaintiffs contentions do not undermine this finding. Admittedly, the MCG admissions criteria for residential mental health treatment and skilled nursing facilities are not identical. As Plaintiffs have pointed out, residential mental treatment is covered if "not feasible at a lower

---

[313] *Id.*

[314] *See* Dkt. 43-7 (MCG skilled nursing facilities guidelines used by BCBS); Dkt. 43-8 (MCG inpatient rehabilitation guidelines used by BCBS); Dkt. 43-9 (MCG hospice care guidelines used by BCBS).

[315] *See* mcg, https://www.mcg.com (last visited Nov. 28, 2022); *see also Clinical Editors*, https://www.mcg.com/about/clinical-editors/ (last visited Nov. 28, 2022).

[316] *Compare AR* at 1108 (MCG admission guidelines for teen residential mental health treatment), *with AR* at 3691 (MCG admission guidelines for skilled nursing facility).

[317] *See generally* mcg, https://www.mcg.com (last visited Nov. 28, 2022).

[318] *See* 29 C.F.R. § 2590.712(c)(4)(iii)(Example 4)(ii)(Conclusion).

level of care," while care at a skilled nursing facility is covered where it is "safer and more practical than attempting care at a lower level."[319]  And residential mental health care is proper only if a patient's condition is likely to improve with treatment or deteriorate without it, while skilled nursing must have a plan to "meet patient needs, promote recovery, and ensure medical safety."[320]  Plaintiffs argue these admissions limitations violate the Parity Act because they are not comparable—that is, there is a meaningful difference between the criteria.[321]  The court disagrees.

To start, there appears no meaningful difference between the selected MCG admissions criteria.  Feasibility is defined as "practicability."[322]  Thus, covering residential mental health care only when it is "not feasible at a lower level of care," is simply another way of saying it is not practical at a lower level of care.[323]  And that is nearly identical to the coverage provision for skilled nursing, providing benefits only when it is "safer and more practical than attempting care at a lower level."[324]  While there may be a slight difference between treatment which is not practical at a lower level and that which is more practical than attempting care at a lower level, the difference does  not rise to the level of a Parity Act violation—it is not "material or significantly disparate."[325]  Likewise, covering mental health treatment only where it will improve a patient's condition and prevent deterioration is comparable to the requirement that skilled nursing treatment must have a plan to promote recovery and ensure medical safety.  In

---

[319] *See AR* at 1108, 3691.

[320] *See AR* at 1108, 3691.

[321] *Plaintiffs' MSJ* at 36–37.

[322] *Feasibility*, Black's Law Dictionary (11th ed. 2019).

[323] *AR* at 1108.

[324] *AR* at 3691.

[325] *James*, 2021 WL 2532905, at *19 (concluding differing limitations complied with the Parity Act because the differences were not "material or significantly disparate").

Case 1:20-cv-00184-RJS-CMR   Document 70   Filed 03/24/23   PageID.8594   Page 48 of 49

sum, the MCG criteria Plaintiffs identify as more stringent treatment limitations are in fact comparable and sufficiently comply with the Parity Act.[326]

But even if the court were to assume the highlighted MCG criteria are not comparable, this does not alter the fact that all medical/surgical services (including skilled nursing) must still be medically necessary under the Plan.  The Plan covers treatment if "required to diagnose or treat the patient's illness, injury, or condition, the condition cannot be diagnosed or treated without it."[327]  This is nearly identical to the MCG language requiring residential care be "not feasible at a lower level of care" and likely to prevent deterioration and improve a patient's condition.[328]  Thus, regardless of whether the MCG criteria are comparable, the Plan imposes a comparable limitation on skilled nursing.

Defendants have met their burden to show the Plan's limitations on mental health care are not more restrictive than the medical surgical analogs, and conversely, Plaintiffs have not met their burden to show the opposite.  Accordingly, there is no Parity Act violation, Plaintiffs are denied summary judgment on this claim, and Defendants are entitled to judgment as a matter of law on this claim.[329]

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is DENIED and Defendants' Motion for Summary Judgment is GRANTED in part.  The court GRANTS

---

[326] *See Christine S. v. Blue Cross Blue Shield of N.M.*, No. 2:18-cv-00874-JNP-DBP, 2021 WL 4805136, at *9 (D. Utah Oct. 14, 2021) (finding "least restrictive level of care" and "the most appropriate" are comparable treatment limitations).

[327] *AR* at 420.

[328] *AR* at 1108.

[329] Defendants make additional arguments toward dismissing the Parity Act claim, but in light of the court's conclusion, they are unnecessary to address.  *See Defendants' MSJ* at 34–40.  In addition, Plaintiffs' request for a hearing to determine remedies on this claim is rendered moot based on this conclusion.  *Plaintiffs' MSJ* at 39–40.

Defendants' Motion on both Plaintiffs' ERISA claim to recover benefits for N.H.'s treatment at ViewPoint, as well as on Plaintiffs' Parity Act claim, but REMANDS the Innercept claim to the administrator to review the administrative appeal of the denial of benefits.

SO ORDERED this 24th day of March, 2023.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge