IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

M.Z., and N.H.,

Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF ILLINOIS, and THE BOEING COMPANY CONSOLIDATED HEALTH AND WELFARE BENEFIT PLAN,

Defendants.

**MEMORANDUM DECISION AND ORDER**

1:20-cv-00184-RJS-CMR

District Judge Robert J. Shelby

Chief Magistrate Judge Cecilia M. Romero

Before the court are Plaintiffs M.Z. and N.H.'s and Defendants Blue Cross Blue Shield of Illinois (BCBS) and the Boeing Company Consolidated Health and Welfare Benefit Plan (the Plan)'s Cross-Motions for Summary Judgment.[1] This action arises out of Defendants' denial of coverage for Plaintiff N.H.'s residential mental health treatments, which Plaintiffs claim violated the Employee Retirement Income Security Act of 1974 (ERISA). For the reasons discussed below, the court DENIES Defendants' Motion and GRANTS Plaintiffs' Motion.

[1] Dkt. 112*, Defendants' Motion for Summary Judgment* (*Defendants' Motion*); Dkt. 113, *Motion for Summary Judgment* (*Plaintiffs' Motion*).

## BACKGROUND and PROCEDURAL HISTORY[2]

The following facts are drawn from the Amended Complaint[3] and the case's Administrative Record.[4] When reviewing cross motions for summary judgment, the court presents a neutral summary of facts and then evaluates the merits of each respective motion in the light most favorable to the nonmoving party.[5]

### I. The Plan

The Plan is a self-funded employee welfare benefits plan under ERISA.[6] At all relevant times, BCBS was a third-party claims administrator for the Plan.[7] Plaintiffs M.Z. is a participant in the plan and her son, N.H., is a beneficiary.[8] The Plan covers "mental health treatment when it is medically necessary and is received from . . . a [h]ospital or treatment facility (as determined by the state agency that licenses mental health and/or substance use disorder treatment facilities)."[9] Medically necessary services are those that meet the following Plan criteria:

- Required to diagnose or treat the patient's illness, injury, or condition, and the condition cannot be diagnosed or treated without it.

---

[2] The court previously considered the denial of coverage decisions regarding Plaintiffs' residential mental health treatments in March 2023. *See* Dkt. 70, *Memorandum Decision and Order* (*2023 MDO*). Here, the court provides a brief summary of background facts preceding the 2023 decision. For a more comprehensive history, *see 2023 MDO* at 2–21; *see also M.Z. v. Blue Cross Blue Shield of Ill.*, No. 1:20-cv-00184-RJS-CMR, 2023 WL 2634240 (D. Utah Mar. 24, 2023).

[3] Dkt. 77, *Amended Complaint*.

[4] The Administrative Record was established in two parts. Dkt. 38 contains the Administrative Record prior to the court's March 2023 Order remanding the relevant claims back to BCBS. Dkt. 103 contains the Administrative Record following the remand. The Administrative Record is paginated continuously through both docket entries. The court refers to the *Administrative Record* (*AR*) as a single source.

[5] *See Stella v. Davis Cnty*, No. 1:18-cv-002, 2019 WL 4601611, at *1 n.1 (D. Utah Sept. 23, 2019) (stating that when parties have filed cross-motions for summary judgment, the court "provides a neutral summary of the facts, which it will view 'in the light most favorable to the nonmoving party' and 'draw reasonable inferences therefrom' while evaluating the motions in turn") (citing *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012)).

[6] *2023 MDO* at 2.

[7] *Id.*

[8] *Id.*

[9] *AR* at 444.

- Consistent with the symptom or diagnosis and the treatment of the condition.

- The most appropriate service or supply that is essential to the patient's needs.

- Appropriate as good medical practice.

- Professionally and broadly accepted as the usual, customary, and effective means of diagnosing or treating the illness, injury, or condition.

- Unable to be provided safely to the patient as an outpatient (for an inpatient service or supply).

- Not experimental or investigational.[10]

The Plan also specifies that the "fact that a physician furnishes, prescribes, recommends, or approves a treatment, service, or supply does not, by itself, make it medically necessary."[11]

In determining whether adolescent residential mental health treatment is medically necessary, the Plan relies upon medical standards titled the Milliman Care Guidelines (MCG).[12] The MCG provide that acute residential treatment for an adolescent is medically necessary when at least one of the following criteria are met:

- Danger to self is present due to **1 or more** of the following:
  - Auditory hallucinations that are contributing to the risk for suicide or serious Harm to self are present.
  - Patient has persistent Thoughts of suicide or serious Harm to self that cannot be monitored adequately at lower level of care as indicated by [designated risk factors].

- Danger to others is present due to **1 or more** of the following:
  - Auditory hallucinations or paranoid delusions contributing to risk for homicide or serious Harm to another are present.

---

[10] *Id*. at 420.

[11] *Id.*

[12] *Id.* at 396–97; *see also Id.* at 205 (the coverage denial letter specifying the "[c]riteria used in denying a request for benefit/service may include, but are not limited to, the MCG care guidelines . . . .").

- Patient has persistent thoughts of homicide or serious Harm to another that cannot be monitored adequately at lower level of care as indicated by [designated risk factors].

- Behavioral health disorder is present with **ALL** of the following:
  - Moderately severe psychiatric or behavioral symptoms or conditions requiring treatment are present daily (or near daily), including **1 or more** of the following:
    - Hallucinations that are somewhat bothersome to patient or are associated with some pressure to respond to voices are present.
    - Delusions that are somewhat bothersome to patient or are associated with some pressure to act on beliefs are present.
    - Disorganized speech that often is difficult to follow is present.
    - Frequent abnormal or bizarre motor behavior is present.
    - Moderate negative symptoms (eg, moderate decrease in facial expression or self-initiated behavior) are present.
    - Mania (eg, frequent, but not daily, periods of extensive mood elevation or irritability) is present.
    - Moderately severe depression is present.
    - Moderately severe anxiety is present.
    - Major comorbid substance use disorder (eg, daily or near daily use) is present and poses a serious threat to health or is expected to impede recovery from underlying primary psychiatric disorder.
    - Major impairment in behavior, including physical or verbal aggression, disruptive behaviors, or internal or external anger manifestations (eg, rumination or outbursts).
    - Other psychiatric symptoms which are acute (eg, hyperactivity, agitation, cognitive impairment, obsessions, compulsions, or other acute symptoms) or represent a worsening over baseline.
  - Serious dysfunction in daily living is present as indicated by **1 or more** of the following:
    - Serious deterioration in interpersonal interactions (eg, impulsive or abusive behaviors) is present.
    - Significant withdrawal and avoidance of almost all social interaction is present.
    - Consistent failure to achieve self-care as appropriate to age or developmental level is present.
    - Serious disturbance in vegetative status (eg, weight change, sleep disruption) threatening physical function is present.
    - Inability to perform adequately in school (including specialized setting) due to disruptive or aggressive behavior is present.
    - Severely diminished ability to assess consequences of own actions is present (eg, acts of severe property damage).

- Patient is receiving continuation of care (eg, transfer from another level of care) for symptoms or behavior and requires treatment available and appropriate to residential level of care (ie, around-the-clock behavioral care).[13]

The Plan also requires preadmission review prior to obtaining mental health inpatient services.[14]

## II. N.H.'s Medical History

N.H. was born in 2001[15] and struggled throughout his childhood and adolescence with mental health and behavioral challenges.[16] These included diagnoses with obsessive compulsive disorder, drug use, depression, and anxiety.[17] Between November 2014 and June 2015, N.H. was hospitalized three times for suicidal ideation and had intensive outpatient treatment for substance abuse through two programs with limited success.[18] Beginning in the fall of 2017, N.H. began exhibiting more problematic behavior.[19] He exhibited sudden outbursts of rage against his mother, including threatening to kill her and twice assaulting her by putting his hands around her throat—once while she was driving and another in throwing her to the ground.[20] N.H.'s parents also reported N.H. was talking nonsensically and making claims of hearing voices, uttering frequent paranoid remarks, and making threats of violence.[21] Between 2015 and 2016, N.H. attended a half dozen residential or intensive centers.[22]

---

[13] *Id.* at 396–97 (citation modified).

[14] *Id.* at 443.

[15] *Id.* at 485.

[16] *See 2023 MDO* at 5–15 for a detailed account of N.H.'s mental health diagnoses, treatments, and other conditions.

[17] *AR* at 84–85.

[18] *Id.* at 84.

[19] *Id.*

[20] *Id.* at 84–85.

[21] *Id.* at 85.

[22] *Id.* at 86.

As N.H.'s behavior worsened, he exhibited more threats of violence, and he was expelled from school after punching a peer.[23] N.H. then attended a boarding school.[24] After some initial improvement there, N.H.'s behavior regressed.[25] In March 2018, N.H. ran away while on spring break, after which he was taken to an outdoor behavioral health program in Oregon.[26] The treatment team at the Oregon program recommended N.H. receive higher level of care because he was exhibiting bipolar or schizophrenic traits.[27] On April 4, 2018, N.H. was subsequently transported to a ViewPoint Center, a residential mental health treatment program in Utah.[28]

N.H.'s parents decided to enroll him in ViewPoint based on their reports of violent behavior toward them, his paranoid comments, possible psychosis, hospitalization history, and his dishonesty and manipulation.[29] ViewPoint staff administered a "Self-Harm/Suicide Risk Assessment" upon N.H.'s arrival.[30] The Assessment indicated N.H. had never attempted suicide, was not then harboring suicidal thoughts or thoughts of hurting himself, nor did he have plans to commit suicide or inflict self-harm.[31] The nurse who conducted the assessment concluded N.H. was at "Mild Risk" for self-harm.[32] In other initial psychiatric testing, ViewPoint medical staff noted N.H. possessed several possible risk factors for suicide, including: "poor impulse control, a

[23] *Id.* at 31.

[24] *Id.*

[25] *Id.* at 31–32.

[26] *Id.* at 32, 86, 99.

[27] *Id.* at 32.

[28] *Id.*

[29] *Id.* at 67, 71, 84.

[30] *Id.* at 856.

[31] *Id.*

[32] *Id.*

history of violence toward others, a substance misuse history, a history of paranoid delusions, [and] poor social support."[33]

N.H. remained at ViewPoint until May 31, 2018.[34] Shortly before his departure from the treatment center, ViewPoint compiled a Multidisciplinary Report with a team of providers.[35] The Report diagnosed N.H. with various psychological disorders, including the following: depression; unspecified anxiety and trauma; attention deficient hyperactivity; neurodevelopmental issues related to executive functioning weaknesses and social challenges; and, provisionally, schizophrenia and attenuated psychosis.[36] During evaluations for the Report, N.H. denied experiencing hallucinations, delusions, or suicidal ideation, and he appeared capable of controlling his behavior and maintaining a calm attitude.[37] The treatment team concluded N.H.'s "overall performance [in testing] was within the impaired range,"[38] and there were concerns that N.H. was in the early stages of developing a substantial or severe psychiatric disorder.[39] ViewPoint's treatment team recommended N.H. receive residential treatment because, although "the diagnostic implications of [N.H.'s] attenuated symptoms of psychosis remain[ed] unclear,"[40] N.H. needed a "higher level" of ongoing, well-structured psychiatric services to monitor the evolution of his psychiatric symptoms and deter further negative impacts on his educational, occupational, and social functioning in a safe environment.[41] The team also

---

[33] *Id.* at 73.

[34] *Id.* at 149.

[35] *Id.* at 78–139.

[36] *Id.* at 95.

[37] *Id.* at 111.

[38] *Id.* at 122.

[39] *Id.* at 123.

[40] *Id.* at 96.

[41] *Id.* at 96, 123–24.

concluded N.H. required a multidisciplinary team because he was unlikely to seek therapy voluntarily and was likely to avoid his "deep, ingrained maladaptive tendencies."[42]

After being discharged from Viewpoint in May 2018, N.H. went directly to Innercept, a residential mental health treatment facility in Idaho.[43] Upon arrival at Innercept, N.H. underwent an "Integral Assessment" (the Assessment) signed by two therapists, a psychologist, a teacher, direct care staff, a registered dietician, and the medical director, Dr. George Ullrich.[44] The Assessment reported N.H. was not "a risk for self-harm or harm to others. However, this therapist recommends we watch him closely as he has a history of becoming violent or suicidal."[45]

After evaluating N.H., Dr. Ullrich expressed concern that N.H. was not taking antipsychotic medications and that his behavior may regress when he transitioned from a confined inpatient facility to an open space.[46] During observation of N.H., Dr. Ullrich noted N.H. "[d]id not exhibit responding to hallucinations visual or verbal" and he denied experiencing them.[47] However, Dr. Ullrich acknowledged N.H. had "a history consistent with delusions and his guarded stance was indirect confirmation of these delusional perceptions that he knows others do not accept."[48] Given N.H.'s symptoms, his treatment plan included regular contact with a psychiatrist and therapist, along with daily group therapy.[49] The Assessment concluded, "[c]urrently, [N.H.] requires an intensive residential setting to support him with his current

[42] *Id.* at 123–24.

[43] *Id.* at 936.

[44] *Id.* at 936–41.

[45] *Id.* at 940.

[46] *Id.*

[47] *Id.* at 941.

[48] *Id.*

[49] *Id.* at 940.

struggles."[50] The Assessment did not directly discuss the MCG elements for establishing medical necessity.[51]

N.H. remained at Innercept's residential treatment facility until August 1, 2019, at which time he was transferred to its transitional living program at Innercept Academy.[52] N.H. remained at Innercept Academy until June 30, 2020.[53]

## III. The Claims Process

M.Z. submitted claims for both ViewPoint and Innercept stays to BCBS.[54] On May 8, 2018, BCBS denied coverage for N.H.'s stay at ViewPoint.[55] The denial letter stated that the treatment was not medically necessary under the MCG, as N.H. did not exhibit "suicidal ideation/homicidal ideation/self-injurious behavior, aggression or psychosis.," and his "treatment can be safely managed at a lower level of care."[56] M.Z. appealed the denial decision, arguing the acute residential treatment was necessary.[57] However, BCBS upheld the denial upon both the first and a second appeal.[58]

BCBS also denied N.H.'s treatment at Innercept.[59] M.Z. submitted a timely appeal on March 27, 2020.[60] However, likely due to logistics disruptions at the start of the COVID-19

---

[50] *Id.* at 939.

[51] *See generally id.* at 936–41.

[52] *2023 MDO* at 15.

[53] *Id.*

[54] *AR* at 43–45, 1525.

[55] *Id.* at 43.

[56] *Id.*

[57] *Id.* at 20–34.

[58] *Id.* at 233–40, 1490–94.

[59] *Id.* at 1531–1542.

[60] *Id.* at 1525.

pandemic, BCBS did not mark the appeal as received until April 8, 2020.[61] BCBS subsequently denied the appeal as time barred because it was submitted after the Plan's 180 day appeal requirement.[62] After conferring with BCBS, M.Z. withdrew the appeal and resubmitted the claim again with additional medical records.[63] BCBS again denied the request because (1) no medical necessity, (2) boarding school services were excluded by the Plan, and (3) Innercept Academy was out-of-network and Plaintiffs did not receive pre-authorization.[64] M.Z. submitted a Level II appeal on June 25, 2020.[65] However, BCBS did not receive the appeal and accordingly never made a final determination on the Innercept claim.[66]

On December 22, 2020, M.Z and N.H. filed a Complaint against Defendants for recovery of benefits under ERISA and for alleged violations of the Mental Health Parity and Addiction Equity Act of 2008 (MHPAE).[67] On March 24, 2023, the court granted summary judgment in favor of Defendants for Plaintiffs' claims related to N.H.'s treatment at ViewPoint.[68] The court reviewed BCBS's denial decision regarding the Viewpoint claims under a deferential arbitrary and capricious standard.[69] The court found BCBS did not act arbitrarily or capriciously in denying the ViewPoint claims because the Administrative Record supported BCBS's conclusions that "N.H. was not at risk of serious harm to himself,"[70] "N.H. did not present a

[61] *Id.* at 1; *see also 2023 MDO* at 38.

[62] *AR* at 1–2.

[63] *Id.* at 2540, 4147–48.

[64] *Id.* at 3069–112, 3128–3132, 3194–3204; *see also* Dkt. 43-5, *Exhibit 5*.

[65] *Id.* at 4120–25.

[66] Dkt. 44, *Declaration of Theresa Griffin* at 2.

[67] *See* Dkt. 2, *Complaint*.

[68] *2023 MDO* (granting Dkt. 40, *Defendants' Motion for Summary Judgment*, and denying Dkt. 39, *Plaintiffs' Motion for Summary Judgment*).

[69] *Id.* at 29.

[70] *Id.* at 30.

serious danger to others,"[71] and N.H. did not "suffer[] from a moderately severe psychiatric or behavioral disorder with daily (or near daily) symptoms accompanied by serious dysfunction in daily living."[72] Accordingly, the court found BCBS's denial of benefits for N.H.'s treatment at ViewPoint was not arbitrary and capricious.[73]

However, the court also concluded BCBS did not fully review Plaintiffs' Innercept claim, as "BCBS never issued a determination on a Level I Innercept appeal because M.Z. withdrew it to allow BCBS time to review newly submitted medical records. And BCBS never addressed the Level II appeal because it did not receive the mailing."[74] Accordingly, the court remanded the Innercept claim to BCBS for review.[75]

## IV. Post-Remand

Following the remand of the Innercept claim, M.Z. again submitted a Level I Appeal of BCBS's denial decision on September 8, 2023.[76] The appeal recounted N.H.'s medical history,[77] as well as the procedural history of the case.[78] M.Z. argued BCBS's Innercept coverage denials were arbitrary and capricious in light of N.H.'s medical record because: "(1) [N.H.]'s care at Innercept was medically necessary, (2) [N.H.] required 24-hour care in a specialized facility to adequately treat his mental health issues and (3) his health condition could not be effectively managed at a lower level of care."[79] However, unlike in the prior appeals which applied the

---

[71] *Id.* at 31.

[72] *Id.* at 32.

[73] *Id.* at 29–35.

[74] *Id.* at 38.

[75] *Id.* at 38–39.

[76] *AR* at 7694–772.

[77] The medical history recounted in the appeal includes N.H.'s history of suicidal ideations, violent episodes, the Integrated Assessment, and other notes from treating clinicians. *See id.*

[78] *Id.*

[79] *Id.* at 7697.

MCG guidelines, the Innercept appeal relied upon the Child and Adolescent Service Intensity Instrument (CASII) Guidelines to establish N.H.'s treatment was medically necessary.[80] CASII is another rating tool used to determine the appropriate level of care for adolescents and children who are in need of mental health treatment.[81] CASII assesses a patient's treatment needs by considering factors including the "Risk of Harm," "Functional Status," "Co-Occurrence of Conditions," "Recovery Environment and Environmental Support," "Resiliency and/or Response to Services," and Parent and Child "Involvement in Services."[82] Based on N.H.'s history of psychiatric hospitalizations, suicidal ideation, aggressive behavior, psychotic symptoms, substance use, and functional impairments impacting daily life, Plaintiffs argued N.H. should be assessed as a Level 4 "Serious Risk of Harm" and ascribed a Composite Score of "Level 5: Non-Secure, 24-hour Psychiatric Monitoring."[83] Plaintiffs contend both of these ratings require care in a non-hospital, residential care setting, and BCBS's failure to cover such treatment at Innercept was therefore arbitrary and capricious.[84]

On October 6, 2023, BCBS denied Plaintiffs' Level I Appeal.[85] The review was conducted by an "external MD reviewer with [a] specialty in Child and Adolescent Psychiatry."[86] The denial provided that under the "MCG 20th Edition Residential Behavioral Health Level of Care," treatment at Innercept was not medically necessary for the following reasons:

---

[80] *See Id.* at 7722–72.

[81] *See Id.* at 7722.

[82] *Id.* at 7724, 7731, 7739–40, 7742–44, 7747–48, 7751–52, 7758–59, 7764.

[83] *Id.* at 7766.

[84] *Id.* at 7766-72.

[85] *Id.* at 22410–12.

[86] *Id.* at 22410.

> [N.H.] did not want to hurt themselves or others. [N.H.] was not agitated or aggressive. [N.H.] was not hearing or seeing things not there. [N.H.] did not have a health problem that needed this care level. [N.H.] could have been safely treated at a lower care level.[87]

The letter did not cite to any specific medical evidence in the record, nor did it directly respond to the evidence cited in the appeal.[88] Additionally, the dates listed on the denial letter did not include the entire time period which N.H. received residential treatment at Innercept. The denial letter listed the non-approved dates as between January 1, 2019 and August 1, 2019, for a total of 212 days.[89] However, the appeal sought review of treatment dates from May 31, 2018 through July 31, 2019, and August 25, 2019 through June 30, 2020.[90] The Parties dispute whether this mistake indicates a typographical error, or that BCBS never actually reviewed the claims for the missing dates at all.[91]

On December 21, 2023, Plaintiffs submitted a Level II Appeal of the denial decision.[92] The Level II Appeal again recounted N.H.'s behavioral and treatment history.[93] The Level II Appeal also informed BCBS that its review of the Level I Appeal failed to review half of the dates N.H. was in treatment at Innercept.[94] Additionally, the Level II Appeal argued that the

---

[87] *Id.*

[88] *See id.*

[89] *Id.*

[90] *Id.* at 7694.

[91] *See Plaintiffs' Motion* at 17 ("BCBSIL's denial letters did not represent that BCBSIL had ever reviewed N.H.'s claims from January 2, 2019 through June 30, 2020."); Dkt. 120, *Defendants' Opposition to Plaintiffs' Motion for Summary Judgment* (*Defendants' Opposition*) at 7 ("BCBSIL complied with these requirements regardless of whether it failed to list some dates of service. It obtained an external physician review with child/adolescent psychiatry expertise who analyzed all of the service dates . . . ."); *id.* at 8–9 (arguing judgment in favor of Plaintiffs would not be an appropriate remedy even if "the date discrepancies in BCBSIL's denial letter constituted a material procedural irregularity").

[92] *AR* at 15049–15166.

[93] *Id.* at 15051–80.

[94] *Id.* at 15054.

MCG are inapplicable because BCBS's use of the guidelines violates the MHPEA,[95] but it also asserted N.H.'s behavioral and treatment history satisfied the requirements for residential acute level care even under the MCG.[96] BCBS therefore acted arbitrarily in denying the Innercept claims.[97]

On February 9, 2024, BCBS denied Plaintiffs' Level II Appeal.[98] The review was performed "by an external MD reviewer with specialty in Child and Adolescent Psychiatry" who had "no involvement in the original denial."[99] Relying on the MCG, the reviewer determined that "[N.H.] did not meet medical necessity guidelines for the following reasons: [N.H.] was not a danger to self or others. [N.H.] was able to take care of self. [N.H.] was able to function day to day. [N.H.] had no medical problems that require residential care."[100] The denial letter again did not cite to any specific medical evidence in the record, nor did it directly address the evidence cited by Plaintiffs' in the Level II Appeal.[101]

On January 8, 2025, Plaintiffs filed an Amended Complaint for recovery of benefits under ERISA.[102] Plaintiffs assert "BCBS[] and the Plan failed to provide coverage for N.H.'s treatment in violation of the express terms of the Plan, which promises benefits to employees and

---

[95] *Id.* at 15054, 15080–82.

[96] *Id.* at 15082–166.

[97] *Id.* at 15163–65.

[98] *Id.* at 22528–41.

[99] *Id.* at 22528–29.

[100] *Id.* at 22529. Defendants also raise the issue that they denied Plaintiffs' claim for transitional housing at Innercept Academy because the Plan does not cover transitional house. *Defendants' Motion* at 14–15. However, Defendants cite to pages with Bates numbers that fall outside the Administrative Record, which ends at 22555. *See Id.* (citing *AR* 22557–61); *AR 22555; see also* Dkt. 121-1 (*Samuel Hell Email*) (email between counsel objecting to including additional documents in the Administrative Record). A court "reviewing a plan administrator's decision for abuse of discretion" is "limited to the administrative record." *Hall v. UNUM Life Ins. Co.*, 300 F.3d 1197, 1201 (10th Cir. 2002) (citation modified). Accordingly, the court does not consider the issue here.

[101] *See Id.* at 22528–41.

[102] *Amended Complaint.*

their dependents for medically necessary treatment of mental health and substance use disorders."[103] On January 23, 2026, both Plaintiffs and Defendants filed their respective Motions for Summary Judgment. The court heard oral arguments on the Motions on August 27, 2026.[104] Both Motions are fully briefed and ripe for review.[105]

## LEGAL STANDARD

ERISA authorizes plan participants and beneficiaries "(A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan[.]"[106] Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[107] "Where the parties in an ERISA case both move for summary judgment and stipulate that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[108] However, the moving party nonetheless "carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment."[109] In instances when the moving party bears the burden of persuasion at trial, it "must establish, as a matter of law, all essential elements of the issue before the

---

[103] *Id.* ¶ 84.

[104] Dkt. 133, *Minute Entry.*

[105] *See Plaintiffs' Motion; Defendants' Opposition*; Dkt. 128, *Reply in Support of Plaintiffs' Motion for Summary Judgment* (*Plaintiffs' Reply*); *Defendants' Motion*; Dkt. 121, *Opposition to Defendants' Motion for Summary Judgment* (*Plaintiffs' Opposition*); Dkt. 127, *Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment* (*Defendants' Reply*).

[106] 29 U.S.C. § 1132(a)(3).

[107] Fed. R. Civ. P. 56(a).

[108] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (citation modified).

[109] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

nonmoving party [is] obligated to bring forward any specific facts alleged to rebut the movant's case."[110]

The court reviews a denial of benefits claim under a deferential arbitrary and capricious standard where the plan, as here, gives the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[111] A denial of coverage decision is arbitrary and capricious if it is not "[the] result of [a] reasoned and principled process," "consistent with any prior interpretations by the plan administrator," "reasonable in light of any external standards," and "consistent with the purposes of the plan."[112]

However, the court only applies a deferential standard of review when the administrator's decision was "a valid exercise" of the plan's discretion."[113] In cases of "serious procedural irregularities," de novo review of the administrator's decision is appropriate.[114] The Tenth Circuit has not articulated what constitutes sufficient procedural irregularities to prompt de novo review, but it has historically applied de novo review when "the benefit-determination process did not substantially comply with ERISA regulations."[115] "An administrator substantially

[110] *Id.*

[111] *LaAsmar*, 605 F.3d at 796 (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)); *see 2023 MDO* at 29 (finding "the Plan grants BCBS discretion in reviewing claims . . . .").

[112] *Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004) (quotation marks and citation omitted); *see also Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 826 (10th Cir. 2008) (stating an arbitrary and capricious review "is limited to determining whether the interpretation of the plan was reasonable and made in good faith" (citation modified)).

[113] *Rasenack ex. rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1315 (10th Cir. 2009) (quoting *Firestone*, 489 U.S. at 111); *see also LaAsmar*, 605 F.3d at 797–98 (stating "deferential review . . . only applies in those instances where an administrator's decision is an actual exercise of a discretion vested in it by the instrument under which it acts") (citation modified)).

[114] *Martinez v. Plumbers & Pipefitters Nat. Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[115] *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1152 (10th Cir. 2009). The Circuit has yet to decide whether the substantial compliance rule remains applicable following the 2002 ERISA amendments. *See Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 828 (10th Cir. 2008).

complied if the procedural irregularity was (1) inconsequential; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant."[116]

## ANALYSIS

The court now turns to the parties' Motions. The court first considers whether the date discrepancies in the denial letters require remand or alters the standard of review. Finding the procedural irregularities here do not warrant remand or non-deferential review, the court then considers whether BCBS's denial of Plaintiffs' Innercept claims was arbitrary and capricious. The court concludes BCBS' decision to deny the claims was arbitrary and capricious because it failed to meaningfully engage with Plaintiffs' arguments or the medical record, and the court remands the claim to BCBS for review in accordance with ERISA.

### I. Date Discrepancies

The court begins its analysis examining whether the procedural violations concerning the missing dates on the denial letters bar arbitrary and capricious review. Plaintiffs argue the date discrepancies in the denial letters mean BCBS did not review "a significant portion of N.H.'s treatment to determine whether it was medically necessary," and "did not articulate any bases for denying N.H.'s claims from January 2, 2019 through July 31, 2019 or again from August 25, 2019 through June 30, 2020."[117] Plaintiffs contend the repeated procedural violations merit the award of benefits for the missing dates regardless of medical necessity because "the administrator has established it is either not able or not willing to comply with ERISA's claims procedure regulations."[118] In the alternative, Plaintiffs request the court grant de novo review to

---

[116] *LaAsmar*, 605 F.3d at 800 (citation modified); *see also* 29 C.F.R. § 2590.715-2719(b)(2)(F)(2) (stating "de minimis violations" which "occur[] in the context of an ongoing, good faith exchange of information" and "do not cause, and are not likely to cause, prejudice or harm to the claimant" are not entitled to de novo review).

[117] *Plaintiffs' Motion* at 21–22.

[118] *Id.* at 24 (citing *D.K. v. United Behav. Health*, 67 F.4th 1224, 1244 (10th Cir. 2023)).

the claims for those dates.[119] Plaintiffs oppose remanding the claims for a third review by BCBS, contending BCBS "has had ample opportunities to review N.H.'s treatment by this point."[120]

Defendants argue that even if there were procedural errors, Plaintiffs are not entitled to the award of benefits or de novo review because they cannot show they suffered any prejudice.[121] The court agrees.

"Not every procedural defect will upset the decision of plan representatives."[122] To be afforded additional remedies, a plaintiff must demonstrate how the procedural error prejudiced the review of his or her claim.[123] The court agrees Plaintiffs are not entitled to an award of benefits due to the date discrepancies because Plaintiffs have failed to show they were prejudiced by the procedural irregularities. Regardless of whether or not BCBS reviewed the claims for the missing dates, the parties do not dispute BCBS did review claims for the dates included in the appeals denial letters.[124] BCBS found the Innercept claims did not meet the coverage requirements for residential mental health treatment under the Plan because "[N.H.] did not want to hurt [himself] or others. [N.H.] was not agitated or aggressive. [N.H.] was not hearing or seeing things not there. [N.H.] did not have a health problem that needed this care level. [N.H.]

---

[119] *Id.* at 23.

[120] *Id.*

[121] *Defendants' Opposition* at 3–8; *Defendants' Reply* at 7–8.

[122] Martinez, 795 F.3d at 1215 n.2 (quoting *Sage v. Automation, Inc. v. Pension Plan & Tr.*, 845 F.2d 885, 895 (10th Cir. 1988)).

[123] *Id.* (quoting *DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co.*, 423 F.3d 6, 16 (1st Cir. 2005)); *see also Brimer v. Life Ins. Co. of N. Am.*, 462 Fed. App'x 804, 809–10 (10th Cir. 2012) (requiring the plaintiff to show evidence of prejudice from a procedural irregularity to afford relief.).

[124] *See Plaintiffs' Motion* at 24–27 (arguing BCBS's decision to deny the claims from the dates listed in the denial letters was arbitrary and capricious, but not contending that BCBS did not in fact review the properly-listed dates); *Defendants' Motion* at 9–16 (outlining the history of the Innercept claims).

could have been safely treated at a lower care level."[125] While Plaintiffs contest these findings as arbitrary and capricious, they do not provide any reason why BCBS's review of the claims for the specific missing dates would result in a different outcome from their review of the dates properly listed. Plaintiffs do not assert that they were prevented from including in the appeals evidence from the missing dates. Nor do they assert that had BCBS reviewed the claims for the missing dates, it would have come to the opposite conclusion for those dates and found that N.H. was a threat to himself and others, or that he could not have been safely treated at a lower level of care.

Plaintiffs argue that they were prejudiced because BCBS "den[ied] Plaintiffs the full and fair review and meaningful dialogue that Defendants had a fiduciary duty to provide[,]"[126] and "a showing that the administrator failed to follow ERISA procedures provides a basis for reversal separate from that provided by a review of the merits of the claim."[127] However, BCBS's failure to include all the dates in the denial letters did not prevent Plaintiffs from submitting any materials or arguments in their two appeals. Further, while procedural violations can form the basis for reversals under ERISA,[128] Plaintiffs do not provide any authority—and the court is unaware of one—establishing that procedural violations absent prejudice to the claimant may be grounds for non-deferential review, yet alone awarding benefits outright. The purpose of ERISA's procedural regulations is "to promote accurate, cooperative, and reasonably speedy decision-making, not to generate an endless stream of business for employment lawyers. . . . [I]nconsequential violations of the deadlines or other procedural

---

[125] *AR* at 22410; *see also, id.* at 22529 (the second denial letter).

[126] *Plaintiffs' Reply* at 6.

[127] *Id.* at 5–6 (quoting *R.E. v. Blue Cross Blue Shield of Ill.*, 2023 WL 8936274, *11 (D. Utah Dec. 27, 2023)).

[128] *See R.E.*, 2023 WL 8936274 at *11.

irregularities would not entitle [a] claimant to de novo review."[129] Automatically awarding Plaintiffs benefits or depriving BCBS of deferential review absent a showing of prejudice would undermine these aims. Because Plaintiffs do not demonstrate they were prejudiced by BCBS's failure to list the entire range of dates in their denial of coverage letters, the court declines to exercise de novo review or award Plaintiffs benefits for the period without further review for the missing dates. Accordingly, the court reviews the entirety of Plaintiffs' Innercept claims under the arbitrary and capricious standard.

## II. BCBS's Denial

Under ERISA, an administrator's denial decision is not arbitrary and capricious if its "interpretation of the plan was reasonable[,] made in good faith"[130] and "supported by substantial evidence."[131] A decision is reasonable if it "(1) was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan."[132] A decision is supported by substantial evidence if "a reasonable mind might accept [the evidence] as adequate to support the conclusion reached by the decision-maker. Substantial evidence requires more than a scintilla but less than a preponderance."[133]

The court is "limited to considering only the rationale given by [BCBS] for [the] denial"[134] and reviews the record as a whole to determine whether substantial evidence exists to

---

[129] *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003).

[130] *LaAsmar*, 605 F.3d at 796 (quoting *Kellog*, 549 F.3d at 825–826).

[131] *D.K.*, 67 F.4th at 1235.

[132] *Id.* (quotation marks and citation omitted).

[133] *Graham v. Hartford Life & Accident Ins. Co.*, 589 F.3d 1345, 1358 (10th Cir. 2009) (quotation marks and citation omitted).

[134] *LaAsmar*, 605 F.3d at 801; *see also David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1313 (10th Cir. 2023) ("[A] court reviewing an administrator's benefits decision cannot consider reasons the administrator included in its internal notes when the administrator never conveyed those reasons to the claimant.").

support the administrator's decision.[135] The Tenth Circuit has identified the following administrative actions as arbitrary and capricious: unreasonable interpretations of an ERISA plan,[136] failure to "address an independent ground for paying benefits" raised by a claimant on appeal,[137] arbitrary refusal to "credit the opinions of a treating physician,"[138] and failure to consistently apply the unambiguous terms of an ERISA plan.[139]

Procedurally, ERISA requires an administrator to provide a participant "adequate notice in writing" that explains the specific reasons for a claim denial and "afford a reasonable opportunity . . . for a full and fair review . . . of the decision denying the claim."[140] For a "full and fair" review, claimants must know what "evidence the decision-maker relied upon," have "an opportunity to address the accuracy and reliability of the evidence, [and] hav[e] the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision."[141] Additionally, administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," but administrators are not

---

[135] *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) ("Substantiality of the evidence is based upon the record as a whole.").

[136] *Scruggs v. ExxonMobil Pension Plan*, 985 F.3d 1356, 1362–63 (10th Cir. 2009) ("[I]f the plan provision is unambiguous, and the plan administrator's interpretation differs from the unambiguous meaning, then the plan administrator's interpretation is unreasonable, and the decision to deny benefits based on that interpretation is arbitrary and capricious.") (internal quotation marks and citation omitted).

[137] *David P.*, 77 F.4th at 1309; *see also Ian C. v. United Healthcare Ins. Co.*, 87 F.4th 1207, 1222 (10th Cir. 2023) ("If an administrator's decision ignores an independent ground for coverage and there is scant evidence to refute the claimant's theory, then the decision fails arbitrary-and-capricious review.").

[138] *Tracy O. v. Anthem Blue Cross Life & Health Ins.*, 807 F. App'x 845, 854 (10th Cir. 2020) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2008)) (ellipsis omitted).

[139] *Id*. (citation omitted).

[140] 29 U.S.C. § 1133(2).

[141] *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992); *see also D.K.*, 67 F.4th at 1242 ("ERISA procedural regulations require the administrator provide the claimant with a comprehensible statement of reasons for the initial denial. In referring to a claimant's medical records, administrator statements may not be conclusory and any health conclusions must be backed up with reasoning and citations to the record." (citation modified)).

required to "accord special weight to the opinions of a claimant's physician" or provide an "explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."[142]

*A. Medical Guidelines*

As a preliminary matter, the court must first address which medical standard to apply for determining medical necessity. The Plan uses the MCG for evaluating whether an individual qualifies for coverage for residential mental health treatment,[143] and BCBS relied on these Guidelines in its denials of Plaintiffs' claims.[144] In the 2023 MDO, the court considered whether the Plan's usage of the MCG violated the MHPAE for disparate treatment of mental health and substance abuse benefits as compared to other medical issues, and the court concluded it did not.[145] However, in their post-remand appeals, Plaintiffs use the CASII guidelines instead of the MCG to argue the residential treatment was in fact medically necessary.[146] Defendants argue Plaintiffs cannot substitute the CASII guidelines for the MCG because Plaintiffs do not provide reliable expert foundation for the alternative standard, and that the court must defer to BCBS's reasonable use of the MCG under the arbitrary and capricious standard.[147] Plaintiffs did not respond in their briefs to Defendants' arguments against CASII, nor do they otherwise provide a reason why the court should nonetheless substitute in the CASIII guidelines. Because the court previously determined BCBS's reliance on the MCG did not violate the MHPAE and Plaintiffs

---

[142] *Nord*, 538 U.S. at 834.

[143] *AR* at 205 ("Criteria used in denying a request for benefit/service may include, but are not limited to, the MCG care guidelines, Health Care Service Corporation Medical Policy, American Society of Addiction Medicine's *The ASAM Criteria*, and the Blue Cross and Blue Shield Association Policy Reference Manual.").

[144] *AR* at 22410–11, 22528–32.

[145] *2023 MDO* at 39–48.

[146] *AR* at 7722–71; *Plaintiffs' Motion* ¶¶ 66–67, 84.

[147] *Defendants' Motion* at 26–30.

do not engage with the issue, the court concludes BCBS did not arbitrarily and capriciously apply the MCG to Plaintiffs' claims. Accordingly, the court reviews BCBS's denial decision under the MCG and not CASII guidelines.

### *B. Denial Decisions*

The court now turns to whether BCBS's decision to deny coverage for N.H.'s treatment at Innercept was arbitrary and capricious. Under the MCG, residential acute mental health care is medically necessary (and therefore covered by the Plan) only if one of the following conditions is present: (1) "danger to self;" (2) "danger to others;" or (3) "moderately severe psychiatric or behavioral symptoms or conditions requiring treatment are present daily (or near daily)… [with] serious dysfunction in daily living."[148]

In its denial of the Level One appeal, BCBS stated N.H. did not qualify for benefits because: he did not want to hurt himself; "was not agitated or aggressive;" was "not hearing or seeing things not there;" did not have a health problem that required the level of care provided at Innercept and "could have been treated safely at a lower level of care."[149] When BCBS again denied benefits, it reasoned N.H. did not meet the MCG guidelines because N.H.: "was not a danger to self or others;" was able to take care of himself; "was able to function day to day;" and "had no medical problems that require[d] residential care."[150]

Plaintiffs argue BCBS's denial decisions were arbitrary and capricious because BCBS did not (1) "specifically explain their reasons for denying [the] claim[s] in detail, including by citing to the provisions of an insurance plan they argue justify denial and explaining why they do so;" and "cit[ing] to evidence when they [made] affirmative claims about [N.H.'s] medical

[148] *AR* at 396–97 (citation modified).

[149] *Id.* at 22410.

[150] *Id.* at 22529.

condition;" (2) "specifically address and engage [N.H.'s] clinicians whose opinions support the conclusion [N.H.'s] treatment [was] medically necessary;" or (3) "specifically respond to theories for coverage raised by Plaintiffs in their appeals."[151] Defendants argue Plaintiffs fail to engage with the merits of its conclusion the treatment was not medically necessary and it is not required to respond to every treatment-provider statement or opinion.[152] Defendants contend it need not "catalog every relevant record entry, engage every provider opinion at length, or respond point-by-point to Plaintiffs' appeals. . . . ERISA requires a meaningful explanation of the basis for denial, not a treatise."[153] The court agrees with Plaintiffs that BCBS failed to properly engage with the medical record and Plaintiffs' arguments in their appeals.

1. Lack of Citations to Medical Evidence

First, BCBS's denial decisions fail to identify the basis in the medical record for its determination that N.H. "was not a danger to self or others, [] was able to take care of himself, [] was able to function day to day, [and] had no medical problems that require residential care."[154] As explained above, "ERISA procedural regulations require the administrator 'provide the claimant with a comprehensible statement of reasons for the initial denial.'"[155] "In referring to a claimant's medical records, administrator statements may not be conclusory and any health conclusions must be back up with reasoning and citations to the record."[156]

[151] *Plaintiffs' Motion* at 24–25.

[152] *Defendants' Reply* at 2–7.

[153] *Id.* at 5–6.

[154] *AR* at 22529 (citation modified).

[155] *D.K.*, 67 F.4th at 1242 (quoting *Gilbertson*, 328 F.3d at 635).

[156] *Id.* (citing *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 Fed. App'x 697, 705–06 (10th Cir. 2018)).

In *D.K. v. United Behavioral Health*,[157] the Tenth Circuit concluded that an administrator's denial decision for a claim for residential acute mental health treatment was arbitrary and capricious because the denial letters did not provide a reasoned analysis with citations to the administrative record.[158] The court concluded the statements at issue were conclusory and the denial was therefore arbitrary.[159] The denial letters in this case suffer a similar deficiency. Despite the presence of evidence indicating medical necessity,[160] both letters limit their discussion on NH.'s condition to a single brief paragraph devoid of any citation to the medical record.[161] BCBS provided no analysis of its conclusion N.H. was not a threat to himself or others, or that he was able to function day to day and did not require residential care.[162] Absent any reasoned analysis citing the medical record, the denial letters are conclusory statements deemed insufficient by the Tenth Circuit.

Defendants argue ERISA does not require BCBS to provide extensive citations in support of their conclusion that N.H.'s conditions did not satisfy the medical necessity requirements under the plan.[163] Defendants rely on the Tenth Circuit decision in *E.W. v. Health Net Life Insurance Co.*[164] for the proposition that "extensive citations to [the claimant's] medical records" are not required when "its findings [are] derived primarily from the *absence* of record evidence supporting continued coverage."[165] *E.W.* distinguished the facts of that case from those in *D.K.*

---

[157] 67 F.4th 1224 (10th Cir. 2023).

[158] *Id.* at 1242–43.

[159] *Id.*

[160] *See AR* at 95–96, 123–24, 936–41.

[161] *See AR* at 22410–12, 22528–41.

[162] *See id.*

[163] *Defendants' Reply* at 6–7.

[164] 86 F.4th 1265 (10th Cir. 2023).

[165] *Id.* at 1301 (emphasis in original).

by highlighting "the statements we found unsubstantiated in *D.K.* were primarily ones the administrator could have supported with citations to the beneficiary's medical records."[166]

*E.W.* is not applicable here. First, while BCBS's conclusions N.H. was not a threat to himself or others do involve a finding based on the absence of record, the conclusion that N.H. "was able to function day to day" is an affirmative finding requiring evidentiary support. And, although BCBS's conclusion that N.H. was not a threat of harm to himself or others is not an affirmative finding, BCBS later based its conclusion on information within the medical record. In their Motion, Defendants cite the Integral Assessment conducted upon arrival at Innercept for its determination "at present N.H. is not seen as a risk for self-harm or harm to others."[167] However, BCBS does not mention this or any other evidence in its denial letters, and after-the-fact justification is not sufficient.[168] Lastly, while E.W. states a denial based on the absence of evidence need not include *extensive* citations to the record, the denial letters here include no citations whatsoever.[169] Accordingly, the denials are arbitrary and capricious for failure to provide Plaintiffs "a comprehensible statement of reasons" for the denials with citations to the medical record.[170]

2. Engagement with Contradicting Evidence and Clinician Opinions

In addition to failing to support its denial of benefits with reasoned analysis, BCBS's denial decisions were also arbitrary and capricious because they failed to engage with contradictory evidence, including statements from clinicians advocating for residential

---

[166] *Id.*

[167] *Defendants' Motion* at 18 (*citing AR* at 940).

[168] *See Ian C.*, 87 F.4th at 1219 (holding the court may only review "those rationales that were specifically articulated in the administrative record as the basis for denying a claim").

[169] *See AR* at 22410–12, 22528–41.

[170] *D.K.*, 67 F.4th at 1242.

treatment.[171] "While an administrator is not required to defer to the opinions of a treating physician, a reviewer may not arbitrarily refuse to credit opinions if they constitute reliable evidence from the claimant."[172] In the Integration Assessment, the assessing therapist concluded that despite finding N.H. was not "at present . . . seen as a risk for self-harm or harm to others," he should be "watch[ed] closely as he has a history of becoming violent or suicidal," and "there could be a regression in his thought organization as he went from a confined inpatient unit to a larger open space."[173] Dr. Ullrich further noted that N.H. had a "a history consistent with delusions,"[174] and he concluded "[c]urrently, [N.H.] requires an intensive residential setting to support him with his current struggles."[175] Plaintiffs highlighted these findings in their appeals, along with other treatment notes from Innercept staff.[176] However, despite Plaintiffs' references to the Integral Assessment which plainly stated N.H. required continued residential treatment, BCBS did not respond to or acknowledge the opinions in either denial letter.[177]

Defendants argue ERISA does not require BCBS "to address every treating-provider statement in detail where those opinions did not address or alter the dispositive point . . . [that] N.H. [did not meet] the plan's medical-necessity criteria during the Innercept stay."[178] However, not only did BCBS not respond to the Integral Assessment and Dr. Ullrichs recommendation; it failed to acknowledge any treatment-provider's statement in its denial letters. Even if BCBS ultimately decided the Assessment did not establish medical necessity, the Assessment certainly

---

[171] *See AR* at 22410–12, 22528–41.

[172] *David P*, 77 F.4th at 1310 (citation modified).

[173] *AR.* at 940.

[174] *Id.* at 941.

[175] *Id.* at 939.

[176] *See Id.* at 7694–772, 15049–15166.

[177] *See Id.* 22410–12; 22528–41.

[178] *Defendants' Reply* at 7.

"addressed . . . the dispositive point" that N.H. required residential medical care. Ultimately, "[b]y simply ignoring the treating care givers opinions, after [Plaintiffs] specifically pointed them out, [BCBS] deprived Plaintiffs of the dialogue ERISA requires between plan administrators and benefits claimants, which is necessary for the statutorily-required 'full and fair' administrative review."[179]

3. Engagement with Plaintiffs' Arguments

Lastly, the court considers whether BCBS adequately engaged with Plaintiffs' arguments. "At a minimum, [an administrator is] required to address [the claimant's] arguments and evidence . . . to provide a 'full and fair review.'"[180] Here, for the reasons detailed above, BCBS fails to acknowledge, let alone adequately engage with, any of the arguments put forth by Plaintiffs in support of their benefits claim.[181] This lack of engagement with Plaintiffs' reasoning and evidence does not meet ERISA's requirement that the denial letters be "comprehensive, in order to form a 'meaningful dialogue' for a full and fair review."[182] Accordingly, BCBS's denial decisions are arbitrary and capricious for this reason as well.

## III. Remedy

Having determined BCBS's denial decisions were arbitrary and capricious, the court now turns to the proper remedy. When a court finds an administrator's denial decision to be arbitrary and capricious, the court "may either remand the case to the plan administrator for a renewed evaluation of the claimant's case or [] order an award of benefits."[183] "Which of these two remedies is proper in a given case, however, depends upon the specific flaws in the plan

---

[179] *David P.*, 77 F.4th at 1311 (citing 29 U.S.C. § 1133(2)).

[180] *Ian C.*, 87 F.4th at 1223.

[181] *See AR* at 22410–12; 22528–41.

[182] *D.K.*, 67 F.4th at 1242 (citation modified) (quoting *Gilbertson*, 328 F.3d at 635).

[183] *Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1015 (10th Cir. 2008) (quotation marks and citation omitted).

administrator's decision."[184] "Generally, remand is appropriate if the administrator failed to make adequate factual findings or failed to adequately explain the grounds for the decision."[185] An award of benefits is appropriate "if the evidence in the record clearly shows that the claimant is entitled to benefits."[186] Additionally, a court may award benefits outright when an "administrator's actions were clearly arbitrary and capricious."[187] In *D.K.*, the court awarded benefits independent of the merits of the claim after "clear and repeated procedural errors[,]" concluding "it would be contrary to ERISA fiduciary principles to mandate a remand and provide [the insurer] an additional 'bite at the apple.'"[188]

Plaintiffs argue an award of benefits is appropriate because "[BCBS] wasted its post-remand opportunity to provide Plaintiffs with a full and fair review of N.H.'s claims."[189] They compare the facts here to those in *D.B. v. United Healthcare Insurance Co.*,[190] in which this court awarded benefits after an administrator committed "violative denial after violative denial *and* a remand process that was not followed and that resulted in further violative denials."[191]

This case presents a close call on whether an outright award of benefits is appropriate. BCBS's denial letters after remand are clearly arbitrary and capricious. The denial letters were four sentences each that provided no reasoned analysis, did not cite to the medical record once—despite Plaintiffs sending a letter specifically identifying all relevant parts of the record that supported finding medical necessity—and failed to meaningfully engage with Plaintiff's

[184] *David P.*, 77 F.4th at 1315 (citation modified).
[185] *Id.* (citation modified).
[186] *Id.* (citation modified).
[187] *D.K.*, 67 F.4th at 1243.
[188] *Id.* at 1244 (quoting *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001)).
[189] *Plaintiffs' Reply* at 7–8.
[190] 1:21-cv-00098-JNP-CMR, 2026 WL 851250 (D. Utah Mar. 27, 2026).
[191] *Id.* at *11.

arguments whatsoever.[192] This is despite the unambiguous requirements the Tenth Circuit established in *D.K.* and related cases, which were issued *before* the denial letters were sent. The only reasonable inference the court takes from the manifest inadequacy of the denials is that BCBS either cannot or will not comply with binding law: ERISA requires insurers "back up [denial decisions] with reasoning and citations to the record." [193] These facts favor an outright award of benefits.

Even so, the lack of repetitive arbitrary and capricious denials here (beyond the two-tiered appeal) causes the court to conclude that remand is nonetheless the proper remedy. Unlike in *D.B.*, where the court initially remanded the case because the administrator was arbitrary and capricious in denying the claims at the outset,[194] the court here previously remanded the Innercept claims because of "procedural irregularities not caused by Defendants."[195] Further, the court simultaneously determined BCBS was not arbitrary and capricious in denying the Viewpoint claims.[196] The case here does not involve "violative denial after violative denial *and* a remand process that was not followed" as in *D.B.*[197] Nor does it include five separate violative denials as was the case in *D.K.*[198] Because the violations at issue here are the first for which BCBS is at fault, and because the record evidence does not clearly show Plaintiffs are entitled to

---

[192] *AR* at 22410–12, 22528–41.

[193] *D.K.*, 67 F.4th at 1242.

[194] *D.B.*, 2026 WL 851250. at *9.

[195] *2023 MDO* at 38.

[196] *See Id.* at 24–35. This decision was issued immediately before the Tenth Circuit decisions in *D.K.,* 67 F.4th 1224; *David P.*, 77 F.4th 1293; and *Ian C.*, 87 F.4th 1207, which Plaintiffs rely on in arguing the post-remand Innercept denial decision letters were arbitrary and capricious.

[197] *D.B.*, 2026 WL 851250, at *11.

[198] *See D.K.*, 67 F.4th at 1235.

benefits, the court remands the Innercept claims for review consistent with this Order and the requirements under ERISA.

## IV. Attorney's Fees

Lastly, the court considers Plaintiffs' request for attorney's fees. Should Plaintiffs prevail in litigation, they "request the opportunity to present in a future briefing additional information demonstrating why an award of prejudgment interest, attorney fees, and costs is appropriate."[199] Defendants do not oppose Plaintiffs' request for future briefing on attorney's fees.[200] Under 29 U.S.C. § 1132(g), "the court in its discretion may allow reasonable attorney's fee and costs of [an ERISA] action to either party."[201] "A fee claimant need not be a prevailing party to be eligible for an award of attorney's fees and costs under ERISA. A court may award fees and costs under 29 U.S.C. § 1132(g)(1) as long as the fee claimant has achieved 'some degree of success on the merits.'"[202] A decision to remand a claim back to the plan administrator for proper review may constitute sufficient success on the merits to warrant an award of attorney's fees.[203] Because the court finds Defendants' decisions to deny Plaintiffs' claim arbitrary and capricious and orders remand to BCBS, the court grants Plaintiffs' request to file additional briefing in favor of an award of prejudgment interest, attorneys fees, and costs.

---

[199] *Plaintiffs' Motion* at 27.

[200] *See generally Defendants' Motion; Defendants' Opposition; Defendants' Reply*.

[201] 29 U.S.C. § 1132(g)(1).

[202] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (citation omitted) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 243 (2010)).

[203] *See Theo M. v. Beacon Health Options, Inc.*, No. 2:19-cv-00364-JNP-DBP, 2023 WL 4826771, at *3 (D. Utah July 27, 2023) ("District courts routinely hold that a determination that an insurer has arbitrarily and capriciously rejected a claim, paired with a remand, is enough to warrant an award of attorney's fees." (collecting cases)); *James C. v. Aetna Health & Life Ins. Co.*, 499 F. Supp. 3d 1105, 1124 (D. Utah 2020) (awarding insured attorney's fees after finding insurer's denial determination arbitrary and capricious and remanding).

## CONCLUSION

For the reasons discussed above, the court DENIES Defendants' Motion[204] and GRANTS Plaintiffs' Motion for Summary Judgment.[205] The court REMANDS the denial of the Innercept claims to BCBS for review. The Clerk of Court is directed to close the case.

SO ORDERED this 31st day of August, 2026.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

[204] Dkt. 112.

[205] Dkt. 113.